# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RINCON BAND OF LUISENO MISSION
INDIANS OF THE RINCON
RESERVATION, AKA Rincon San
Luiseno Band of Mission Indians,
AKA Rincon Band of Luiseno
Indians,

    *Plaintiff-Appellee,*

    v.

ARNOLD SCHWARZENEGGER,
Governor of California; STATE OF
CALIFORNIA,

    *Defendants-Appellants.*

No. 08-55809

D.C. No.
3:04-cv-01151-
WMC

RINCON BAND OF LUISENO MISSION
INDIANS OF THE RINCON
RESERVATION, AKA Rincon San
Luiseno Band of Mission Indians,
AKA Rincon Band of Luiseno
Indians,

 *Plaintiff-Appellee-Cross-Appellant,*

    v.

ARNOLD SCHWARZENEGGER,
Governor of California; STATE OF
CALIFORNIA,

    *Defendants-Appellants-Cross-*
         *Appellees.*

No. 08-55914

D.C. No.
3:04-cv-01151-
WMC

OPINION

Appeal from the United States District Court
for the Southern District of California
William McCurine, Magistrate Judge, Presiding

5873

Argued and Submitted
November 4, 2009—Pasadena, California

Filed April 20, 2010

Before: Thomas G. Nelson, Jay S. Bybee and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Bybee

## COUNSEL

Peter H. Kaufman, Deputy Attorney General of the State of California, San Diego, California; Marc Le Forestier, Deputy Attorney General of the State of California, Sacramento, California, for the defendants-appellants/cross-appellees.

Kimberly A. Demarchi, Lewis & Roca LLP, Phoenix, Arizona; Scott D. Crowell, Crowell Law Offices, Kirkland, Washington, for the plaintiffs-appellees/cross-appellants.

Steven J. Bloxham, Fredericks Peebles & Morgan LLP, Sacramento, California, for the amicus.

---

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.*, provides that a state must negotiate in good faith with its resident Native American tribes to reach compacts concerning casino-style gaming on Native American lands. Defendants-Appellants/Cross-Appellees the State of California (the State) and Governor Arnold Schwarzenegger (Governor Schwarzenegger) (collectively as parties to this litigation, the State) appeal the district court's finding that, in violation of IGRA, 25 U.S.C. § 2710(d)(3)(A), the State negotiated in bad faith with Plaintiff-Appellee/Cross-Appellant the Rincon Band of Luiseno Mission Indians (Rincon) concerning amendments to the parties' existing tribal-state gaming compact.

The district court based its bad faith finding on the State's repeated insistence that Rincon pay a portion of its net revenues into the State's general fund, which the district court determined to be an attempt by the State to impose a tax on the tribe in violation of 25 U.S.C. § 2710(d)(4).

The State challenges the district court's characterization of its requests as an attempt to impose a tax, and argues that even if it was attempting to impose a tax, that alone is insufficient to support the finding of bad faith. We affirm.[1]

---

[1]Because we affirm the district court's finding of bad faith on the issue of the State's demands for revenue sharing, we do not reach any of the alternative grounds for a finding of bad faith asserted by Rincon on cross-appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

*The 1999 Compacts*

In the fall of 1999, the State (through then-governor Gray Davis) and Rincon negotiated a compact granting Rincon the right to operate casino-style (class III[2]) gaming on its lands located near San Diego, California, subject to certain limitations.[3] Simultaneously, the State's negotiations also resulted in similar compacts with dozens of other tribes across California. Although some of the 1999 compacts have since been renegotiated, the 1999 compact between Rincon and the State remains operative.

While negotiations over the 1999 compacts were pending, the California Supreme Court handed down its decision in *Hotel Employees & Restaurant Employees International Union v. Davis*, 981 P.2d 990 (Cal. 1999). In that case, the California Supreme Court determined that the California constitution prohibited everyone in the state, including Indian tribes, from operating Las Vegas-style casinos. As a major consideration, and in order to make the proposed 1999 compacts legally enforceable, the State sponsored a constitutional amendment—Proposition 1A—that would authorize tribal gaming in California.[4]

---

[2]IGRA divides gaming into three classes. Class I involves traditional tribal gaming; class II involves bingo and non-banked card games; class III involves gambling not covered in class I or class II (such as casino-style gaming, including slot machines and banked card games). 25 U.S.C. § 2703.

[3]The compact included several terms that are irrelevant to the issues addressed in this opinion. For context, however, we note that under the 1999 compact, Rincon was permitted to operate a certain number of devices, plus draw additional device licenses from a limited statewide pool. The 1999 compact thus reflected a system of limited gaming.

[4]For a more detailed history of Proposition 1A and related state/tribe negotiations concerning the 1999 compacts, *see In re Indian Gaming Related Cases*, 331 F.3d 1094 (9th Cir. 2003) and *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003).

In March 2000, California voters approved Proposition 1A, thereby vivifying the 1999 compacts. Not only did Proposition 1A permit tribes to conduct class III gaming lawfully, it effectively gave tribes a state constitutional monopoly over casino gaming in California. *In re Indian Gaming Related Cases*, 331 F.3d 1094, 1103 (9th Cir. 2003) (*Coyote Valley II*).

*Revenue Sharing Under the 1999 Compacts*

In consideration for the State's efforts in securing the passage of Proposition 1A (without which the tribes would have been barred from conducting class III gaming in the State of California), the tribes agreed to share a portion of their expected revenues. *Flynt v. Cal. Gambling Control Comm'n*, 129 Cal. Rptr. 2d 167, 175-77 (Ct. App. 2002). The State originally took the position that the revenue should be for general use, but abandoned that position during the negotiations in favor of tribal proposals. *See Coyote Valley II*, 331 F.3d at 1102-03, 1113. The tribes agreed to pay a portion of their revenues into two funds: the Revenue Sharing Trust Fund (RSTF) and the Special Distribution Fund (SDF). *See id.* at 1104-05. Monies paid into the RSTF are redistributed to tribes who choose not to, or are unable to, conduct their own gaming activities. *Id.* at 1105. Monies paid into the SDF, on the other hand, are used to fund:

> (a) grants for programs designed to address gambling addiction; (b) grants for the support of state and local government agencies impacted by tribal gaming; (c) compensation for regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the implementation and administration of the compact; (d) payment of shortfalls that may occur in the RSTF;

and (e) "any other purposes specified by the legisla-
ture."**⁵**

*Id.* at 1106.

In *Coyote Valley II*, appellants questioned whether the
RSTF and SDF provisions of the 1999 compacts were lawful
since IGRA, 25 U.S.C. § 2710(d)(4), precludes states from
imposing taxes on Indian gaming. 331 F.3d 1094. We held
that the RSTF and SDF were permissible notwithstanding
§ 2710(d)(4) because, as more fully explained *infra*, the
nature of the revenue sharing and the constitutional exclusiv-
ity obtained in consideration for it were primarily motivated
by a desire to promote *tribal* interests. *Id.* at 1110-15. We fur-
ther concluded that by virtue of the 1999 compacts and Propo-
sition 1A, the State gave all tribes in California significant
opportunities to benefit from gaming without taking anything
significant for itself, beyond what was required to protect its
citizens from the adverse consequences of gaming, and to ful-
fill other regulatory and police functions contemplated by
IGRA. *Id.*

### The 2003-2006 Compact Renegotiations

Operating under its 1999 compact, Rincon began to gener-
ate significant revenue that enabled it to improve tribal gov-
ernmental functions and become economically self-sufficient.
By 2003, Rincon desired to expand its operations beyond
what the 1999 compact permitted. Accordingly, in March of
that year, Rincon notified the State of its interest in renego-
tiating certain provisions of the 1999 compact.

---

**⁵**In this opinion, we focus only on subsections (a), (b) and (e) of the
SDF. Subsection (c) is expressly authorized by § 2710(d)(3)(C)(iii), and
the State does not rely upon it in its quest because it seeks to deposit funds
into its general fund, not one with earmarked uses. Subsection (d) is effec-
tively part of the RSTF so it need not be analyzed separately. We have
previously construed subsection (e) to cover only those purposes *directly*
related to gaming. *Coyote Valley II*, 331 F.3d at 1113-14.

Negotiations began in 2003 in response to Rincon's request, but in October of that year, California voters recalled Governor Davis and elected Governor Schwarzenegger in his stead. Although negotiations eventually reconvened, they quickly assumed a decidedly different tone. Instead of requesting funds to help defray the costs of gaming, or to benefit Indian tribes, the State demanded that Rincon pay a significant portion of its gaming revenues into the State's general fund.

The State made its first offer to Rincon on November 10, 2005.[6] The State offered Rincon the opportunity to operate 900 additional devices plus the 1600 devices Rincon already operated, but only if Rincon would agree to pay the State 15% of the net win on the new devices, along with an additional 15% annual fee based on Rincon's total 2004 net revenue. In exchange for the 15% revenue share demanded, the State offered Rincon an "exclusivity provision."[7]

[6]In June 2004, Rincon filed the present suit in order to force the State to expedite negotiations. The offers described herein were both IGRA negotiations and on-the-record settlement negotiations.

[7]Specifically, the State offered:

1. The State would agree to allow the Tribe to operate an additional 900 Gaming Devices outside of the licensing pool established by the Tribe's existing compact as long as the total number of Gaming Devices in operation by the Tribe do [sic] not exceed 2500 Gaming Devices[;]

2. The Tribe would be required to maintain its existing Gaming Device licenses, but the parties would negotiate over the amount of the contributions made by the Tribe to the [RSTF] in connection therewith;

3. The Tribe would pay annually to the State 15% of the average net win for each of the additional Gaming Devices outside of the licensing system that it operates pursuant to the compact amendment, provided that the average net win is calculated on the basis of all Gaming Devices operated by the Tribe;

4. The Tribe would pay to the State, for the duration of the compact term, an annual fee equal to 15% of the net win in Fiscal

Rincon countered that, in order to obtain additional devices, it would agree to some per device fees. Rincon emphasized, however, that the use of any fees it paid had to be limited to paying for the costs of regulating gaming, building infrastructure needed to support gaming operations, and mitigating adverse impacts caused by gaming operations. Rincon further stated that "with all due respect, we are not asking for exclusivity and the State's analysis does not hold water as it relates to Rincon in its current circumstance."

Rincon also noted that Proposition 1A already provided for tribal gaming exclusivity, so it was not seeking whatever further exclusivity might provide. Rincon's lands are located in the middle of a saturated tribal gaming market. Accordingly, no form of tribal exclusivity could shelter Rincon from substantial competition. As long as the proposed exclusivity provision related only to freedom from *non*-tribal competition, "exclusivity" would not provide Rincon with any meaningful economic advantages that would warrant the tribe making the requested payments.

The State interpreted Rincon's counterproposal for limited-use, per device fees and its rejection of exclusivity to be a

---

Year 2004 from the Gaming Devices in operation at the Tribe's casino;

5.   The term of the amended compact would be the same as that of theexisting compact;

6.   A portion of the Tribe's payment to the State could be designed for San Diego County and CalTrans, which amount would be negotiated between the Tribe and the State . . . [;]

7.   Except as set forth in paragraphs 5 and 8, the amendment would contain the same non-economic provisions as the Pala Compact Amendment;

8.   The Tribe [would] be afforded an exclusivity provision, the terms of which [would] be subject to further negotiation . . . the exclusivity provisions would be "similar" to the Pala compact amendment. . . .

request that the State agree to allow Rincon to operate additional devices beyond the 1999 compact limits "without offering the State anything meaningful in return." The State held firm in its demand that a portion of tribal gaming revenues be paid into the State's general fund, rather than into an earmarked fund.

Rincon re-countered with an offer substantially mirroring its previous offer, but offering slightly increased per device fees. Rincon also presented several expert reports on the financial impact the State's offer would have on Rincon. By Rincon's calculations,

> the State's offer . . . would require Rincon to pay an additional $23 million in fees for the machines currently in play at Rincon's gaming operation pursuant to the 1999 Compact. . . . By imposing the 15% fee on the Tribe's net win as of Fiscal year 2004, the Tribe would be required to pay 15 to 20 times what it is paying now without adding a single machine onto the gaming floor! The State's proposal is a poorly disguised tax, which is impermissible under IGRA.

The State made its next counteroffer on October 23, 2006. That offer included substantially the same terms as its November 10, 2005 offer, but offered that the compact term would be extended for five years, and that Rincon would pay an annual fee equal to 10% (instead of 15%) of its net win based on fiscal year 2005 (instead of 2004). The State noted that the terms it was offering Rincon were similar to those already accepted by a handful of other tribes and approved by the Department of the Interior. At Rincon's request, on October 31, 2006, the State made an alternative offer to allow Rincon to operate 400 additional devices with no other changes to the existing compact. In exchange for the 400 additional devices, Rincon would have to pay $2 million annually to the

RSTF, plus 25% of Rincon's net win on those additional 400 devices to the State's general fund.

The State accompanied this last counteroffer with its own expert analysis comparing the value to Rincon of continuing to operate its current 1600 devices under the 1999 compact to the value to Rincon of accepting the State's counteroffer of 2500 devices with a 10% annual fee. The State's expert concluded that if Rincon accepted the State's offer, it would pay California $38 million and retain $61 million in net revenue. If Rincon maintained its operations under the 1999 compact, it would pay the State nothing and retain $59 million in net revenue. Hence, according to the State's expert, Rincon stood to gain $2 million in additional revenues if it accepted the amendment. In contrast, the State stood to gain $38 million. Rincon rejected the State's counteroffer, and the record of negotiations then closed.

Having reached an impasse, the parties filed cross-motions for summary judgment in the district court. The district court granted summary judgment in favor of Rincon, and this timely appeal followed.

## JURISDICTION AND STANDARD OF REVIEW

IGRA grants district courts original federal jurisdiction over tribal claims that a state has failed to negotiate in good faith concerning class III gaming rights. 25 U.S.C. § 2710(d)(7)(A)(i). California has waived its Eleventh Amendment immunity from such suits.[8] Cal. Gov't Code

---

[8]Many states have not waived their Eleventh Amendment immunity under IGRA as California has. The dissent's reliance on the prevalence of compacts containing revenue sharing provisions is therefore suspect because that reliance ignores the fact that many of the states involved in those compacts would not permit tribes to challenge state demands as made in bad faith. *See, e.g., Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) (holding that IGRA did not abrogate state Eleventh Amendment

§ 98005; *Hotel Employees*, 981 P.2d at 1011. We have jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1).

Summary judgment is appropriate if there is no genuine issue of material fact and, even making all reasonable inferences in favor of the nonmoving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004). The State argues that the district court erred in granting summary judgment against it on the issue of whether it negotiated in good faith. *See* 25 U.S.C. § 2710(d)(7)(B)(iii-iv). Whether the negotiations were conducted in good faith is a mixed question of law and fact that we review de novo. *Coyote Valley II*, 331 F.3d at 1107 (citing *Diamond v. City of Taft*, 215 F.3d 1052, 1055 (9th Cir. 2000)).

---

immunity, so Florida state actors could not be sued by tribe to force good faith negotiations); *Mescalero Apache Tribe v. New Mexico*, 131 F.3d 1379, 1384-85 (10th Cir. 1997) (holding that New Mexico has not waived its Eleventh Amendment immunity to IGRA suits); *Ponca Tribe of Ok. v. Oklahoma*, 89 F.3d 690 (10th Cir. 1996) (same for Oklahoma); *Santee Sioux Tribe of Ne. v. Nebraska*, 121 F.3d 427, 431 (8th Cir. 1997) (same for Nebraska); *Sault Ste. Marie Tribe of Chippewa Indians v. Michigan*, 800 F. Supp. 1484 (W.D. Mich. 1992) (same for Michigan). Tribes in states that have not waived their Eleventh Amendment immunity for IGRA suits have no recourse to challenge the validity of revenue sharing, and some therefore choose to accept revenue sharing rather than go without a compact. *See Pueblo of Sandia v. Babbitt*, 47 F. Supp. 2d 49, 51, 56-57 & n.7 (D.D.C. 1999) (explaining that the Department of the Interior believed the revenue sharing provision was illegal, but also believed that it had no choice but to allow the compact to go into effect because the tribe would have no recourse against the state to obtain a legal compact). Moreover, this reality—for better or worse—will prevent the proliferation of lawsuits feared by our dissenting colleague. The dissent suggests that 25 C.F.R. §§ 291.1 *et seq.* is a potential vehicle for tribes to challenge state demands, Dissent at 5971. n.27, but the only circuit court to consider the question has held the regulations invalid. *Texas v. United States*, 497 F.3d 491 (5th Cir. 2007), *cert. denied sub nom. Kickapoo Traditional Tribe of Tex. v. Texas*, 129 S. Ct. 32 (2008). The validity of the regulations is not before us, and we therefore do not find it appropriate to rely on them, or express any opinion as to their validity.

## DISCUSSION

From the advent of colonists in North America, the new arrivals promptly began encroaching on Indian lands, and frequently treating Indians unfairly. To protect against further "great Frauds and Abuses" perpetrated by the colonists against the Indians, and to avoid war, the British Crown assumed ultimate authority over Indian affairs. 1-1 Cohen's Handbook on Fed. Indian Law § 1.02 (Matthew Bender 2009). When our nation was formed, the federal government essentially took the place of the Crown, with Congress being granted the power to "regulate Commerce . . . with the Indian tribes," U.S. Const. art. I, § 8, cl. 3, and the President being given the power to make treaties (including with Indian tribes) with the consent of the Senate. U.S. Const. art. II, § 2, cl. 2. According to the Supreme Court, the federal government's relationship to the tribes was that of a "ward to his guardian." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831). Nevertheless, promises and treaties were repeatedly broken or ignored as Indians were swept from their lands and homes by states, hoards of settlers, and sometimes even by the "guardian" federal government itself, when they wanted the lands or resources possessed by those Indians. *See* Cohen's, *supra*, at §§ 1.02-1.03. Recounting one such instance, the Supreme Court in *United States v. Sioux Nation of Indians*, detailed the history of how, first by military force, then by Congressional act, the government deprived the Sioux tribe in South Dakota of much of its land because gold was discovered in the Black Hills. 448 U.S. 371 (1980). Today, many tribes have struck figurative gold with casino gaming and, again, some state governments, just like their predecessors, are maneuvering to take, or at least share in, some of that figurative gold.

Mindful of this ignominious legacy, Congress enacted IGRA to provide a legal framework within which tribes could engage in gaming—an enterprise that holds out the hope of providing tribes with the economic prosperity that has so long

eluded their grasp—while setting boundaries to restrain aggression by powerful states. *See* S. Rep. No. 100-446, at 33 (1988) (statement of Sen. John McCain), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3103; 134 Cong. Rec. at S12654 (statement of Sen. Evans). In passing IGRA, Congress assured tribes that the statute would always be construed in their best interests. *See, e.g.,* S. Rep. No. 100-446, at 13-14, *as reprinted in* 1988 U.S.C.C.A.N. at 3083-84.

**[1]** Under IGRA, a tribe may conduct class III gaming only once a compact with its home state is in effect. Because the compact requirement skews the balance of power over gaming rights in favor of states by making tribes dependent on state cooperation, IGRA imposes on states the concomitant obligation to participate in the negotiations in good faith. 25 U.S.C. § 2710(d)(3)(A). If a court finds that a state has failed to negotiate in good faith, IGRA empowers the court to order additional negotiations and, if necessary, to order the parties into mediation in which a compact will be imposed. § 2710(d)(7).

In evaluating a State's good faith, the district court:

> (I) *may* take into account the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities, and
>
> (II) *shall* consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith.

§ 2710(d)(7)(B)(iii) (emphasis added); *see Coyote Valley II*, 331 F.3d at 1108-09 (quoting at length S. Rep. No. 100-446, at 13-14, *as reprinted in* 1988 U.S.C.C.A.N. at 3083-84, which provides guidance on how Congress intended § 2710(d)(7)(B)(iii)(I) to be interpreted).

**[2]** In addition to specifying criteria for evaluating a state's good faith, IGRA outlines permissible tribe-state negotiation topics.

> (C) Any Tribal-State compact . . . may include provisions relating to—
>
> (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
>
> (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
>
> (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
>
> (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
>
> (v) remedies for breach of contract;
>
> (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
>
> (vii) any other subjects that are directly related to the operation of gaming activities.

§ 2710(d)(3)(C). However, the list of permissible negotiation topics is circumscribed by one key limitation on state negotiating authority:

> Except for any assessments that may be agreed to under [§ 2710(d)(3)(C)(iii)], nothing in this section

> shall be interpreted as conferring upon a State . . . authority to impose any tax, fee, charge, or other assessment upon an Indian tribe . . . . No State may refuse to enter into the negotiations . . . based upon the lack of authority in such State . . . to impose such a tax, fee, charge, or other assessment.

25 U.S.C. § 2710(d)(4). IGRA limits permissible subjects of negotiation[9] in order to ensure that tribal-state compacts cover

---

[9]Our dissenting colleague suggests that § 2710(d)(3)(C) is not exhaustive, and then goes on to say that even if it is, reading the "catch-all" provision, § 2710(d)(3)(C)(vii), restrictively conflicts with *Coyote Valley II*. Dissent at 5947-51. The language and structure of § 2710(d)(3)(C) suggests it is exhaustive. There are seven categories of what "may" be negotiated. Although "may" indicates permissiveness as the dissent explains, to grant permission is not necessarily to grant carte blanche. What is "permitted" is limited. Section 2710(d)(C)(vii) explicitly addresses unenumerated topics, but limits them to those "directly related" to gaming. *See Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 933-34 (7th Cir. 2008) (reading § 2710(d)(3)(C) as exhaustive for jurisdictional purposes); *see also Coyote Valley II*, 331 F.3d at 111 (noting that Congress "*limit[ed]* the proper topics for compact negotiations to those that bear a direct relationship to the operation of gaming activities" (emphasis added)). Significantly, what compels a limited reading of the permitted topics is the canon of construction obligating us to construe a statute abrogating tribal rights narrowly and most favorably towards tribal interests. *See United States v. Winans*, 198 U.S. 371, 381 (1905) (stating that "the treaty was not a grant of rights to the Indians, but a grant of right from them,—a reservation of those [rights] not granted")*; Bryan v. Itasca County*, 426 U.S. 373, 392 (1976) ("[I]n construing this admittedly ambiguous statute, we must be guided by that eminently sound and vital canon that statutes passed for the benefit of dependent Indian tribes are to be liberally construed, doubtful expressions being resolved in favor of the Indians." (internal quotation marks, citations, and ellipsis omitted)). The dissent is correct that *Coyote Valley II* held that § 2710(d)(3)(C)(vii) is not ambiguous, and we do not hold otherwise. Whether revenue sharing fits into the unambiguous phrase "directly related to gaming" however is a subject of significant dispute between the parties. To help resolve the dispute, we, like the *Coyote Valley II* court, consider relevant the Congressional directive to construe ambiguities related to the issues covered by IGRA most favorably to tribal interests. *Coyote Valley II,* 331 F.3d at 1111 (quoting S. Rep. No. 100-446, at 15, reprinted in 1988 U.S.C.C.A.N. at 3085). Even if the dissent is correct that resolution of this issue features a clash of "dueling canons," Congress' specific invocation of the tribal canon persuades us which canon must triumph here.

only those topics that are related to gaming[10] and are consistent with IGRA's stated purposes, *see Coyote Valley II*, 331 F.3d at 1111, which are:

> (1) to provide a statutory basis for the operation of gaming by Indian tribes *as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments*;
>
> (2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, *to ensure that the Indian tribe is the primary beneficiary of the gaming operation*, and to assure that gaming is conducted fairly and honestly by both the operator and players; and
>
> (3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and *to protect such gaming as a means of generating tribal revenue*.

---

[10]"Gaming by its very nature is a unique form of economic enterprise and the Committee is strongly opposed to the application of the jurisdictional elections authorized by this bill to any other economic or regulatory issue that may arise between tribes and States in the future." S. Rep. No. 100-446, at 14, *as reprinted in* 1988 U.S.C.C.A.N. 3071, 3084. *See also* 134 Cong. Rec. S12643-01, at S12651 (1988) ("There is no intent on the part of Congress that the compacting methodology be used in such areas such as taxation, water rights, environmental regulation, and land use. . . . The exigencies caused by the rapid growth of gaming in Indian country and the threat of corruption and infiltration by criminal elements in class III gaming warranted the utilization of existing State regulatory capabilities in this one *narrow* area.") (statement of Sen. Inouye) (emphasis added).

§ 2702 (emphasis added); *see also Artichoke Joe's*, 353 F.3d at 715.

Here, the State repeatedly demanded that Rincon agree to pay into the State's general fund 10-15% of Rincon's annual net win, and up to 25% of Rincon's revenue from any new devices Rincon would operate under an amended compact. Once Rincon proffered evidence suggesting that the State had acted in bad faith by attempting to impose taxation, "the burden of proof [shifted to] the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities." § 2710(d)(7)(B)(ii). We conclude that the State failed to meet its burden.

## I.  Taxation Demands "Shall" Be Considered Evidence of Bad Faith

**[3]** Under § 2710(d)(7)(B)(iii)(II), a court *must* consider a "demand" for a tax to be made in bad faith.[11] A tax is "a *charge*, usu[ally] *monetary*, *imposed* by the government on persons, *entities, transactions*, or property *to yield public rev-*enue." Black's Law Dictionary 1594 (9th ed. 2009) (emphasis added). The State insisted that Rincon pay at least 10% of its net profits into the State's general fund. According to California Government Code § 16300, "[t]he General Fund consists of money received into the treasury and not required by law to be credited to any other fund." No amount of semantic sophistry can undermine the obvious: a non-negotiable, mandatory payment of 10% of net profits into the State treasury for unrestricted use yields public revenue, and is a "tax." Moreover, unlike what occurred in the 1999 negotiations,

---

[11]In *Coyote Valley II* we were convinced that any inference of bad faith had been rebutted, so we did not need to address this threshold inquiry into whether the RSTF and SDF were taxes demanded by the State. Because the bad faith question is more difficult in this case, we commence with the threshold inquiry.

none of the State's communications during the renegotiations that occurred after the change in administration in 2003 reflected a willingness to take its *general fund* revenue sharing demand off the table. The State repeatedly emphasized its position that it would not give Rincon more devices or time without a reciprocal benefit to the State, and the record reveals that no other "benefit" was demanded besides monetary payments into the general fund. Webster's Third New International Dictionary 598 (2002) defines "demand" as "to call for as useful, necessary, or requisite: make imperative." The State's repeated and forceful insistence on monetary payments to the general fund undoubtedly constitutes a "demand." Under the plain language of § 2710(d)(7)(B)(ii)(II), the State's demand for the payment of a tax is evidence of the State's bad faith.

Our dissenting colleague faults us for our characterization of the 10-15% revenue share as a "tax," primarily because he contends we fail to appreciate the import of the word "imposed" in the definition of a "tax." Dissent at 5934-37, 5943-45. He argues that IGRA merely creates a context for "voluntary" negotiations, and that no matter how "hard line" the State's position is, it still has not attempted to exercise authority to "impose" a tax.

The flaw in this argument—related to a faulty assumption made throughout the dissent—is that it ignores the plain fact that neither tribes nor states enter IGRA negotiations "voluntarily" in the way parties do in all the examples cited by the dissent. IGRA negotiations are therefore distinguishable from regular contract negotiations. When private parties, or independent sovereign entities, commence contract negotiations, they generally do so because each has something of value the other wants, and each side has the right to accept or reject an offer made, based on the desirability of the terms. If negotiations fail, neither party has a right to complain. Not so in IGRA negotiations. In IGRA, Congress took from the tribes collectively whatever sovereign rights they might have had to

engage in unregulated gaming activities, but imposed on the states the obligation to work with tribes to reach an agreement under the terms of IGRA permitting the tribes to engage in lawful class III gaming activities. If IGRA negotiations break down between a state and a tribe because the state does not come to the bargaining table in good faith, IGRA specifically provides that courts, and the Secretary of the Interior, can intervene to impose a gaming arrangement without the affected state's approval. *See* § 2710(d)(7)(B)(iii-vii). Thus, while IGRA was designed to give states a voice in Indian gaming, it was not designed to give states complete power over tribal gaming such that each state can put the opportunity to operate casinos up for sale to the tribe willing to pay the highest price. *See* § 2702; *see also Cheyenne River Sioux Tribe v. South Dakota*, 3 F.3d 273, 281 (8th Cir. 1993) (noting that IGRA imposes mandatory duties upon states and gives them incentives to negotiate, but that it also provides tribes with alternative routes to a compact if the states choose not to cooperate); *Dalton v. Pataki*, 835 N.E.2d 1180, 1189 (N.Y. 2005) ("IGRA confers a benefit on the state by allowing it to negotiate and to have some input into how class III gaming will be conducted.").

The dissent claims that § 2710(d)(4) means only that IGRA should not be interpreted as "*conferring*" upon states the "*authority to impose*" taxes and fees. Dissent at 5925-26. But nothing in IGRA can reasonably be construed as conferring on states the power to impose anything; all the states are empowered to do is negotiate. The logic underlying the dissent is that there is no "imposition" when there is "negotiation." But by that logic, not only may states demand revenue sharing like California has done here, they could take any "hard-line" stance, such as demanding that a tribe agree to waive its sovereign immunity from taxation, as a condition of obtaining more gaming devices. No one disputes that requiring a tribe to waive its sovereign immunity from state taxation in order to obtain a compact is clearly contrary to IGRA. And yet, if a tribe "agreed" to do so, the wavier of taxation immu-

nity would be no less "negotiated" than the revenue sharing the dissent advocates here.

Exercising an authority to "impose" in the context of IGRA must therefore relate to something the state does during the negotiations process to extract an improper concession. In other words, the only conceivable way a state could "impose" something during negotiations is by insisting, over tribal objections, that the tribe make a given concession—a concession beyond those specially authorized by § 2710(d)(3)(C)[12] and contrary to the tribe's sovereign interests—in order to obtain a compact.[13]

The dissent acknowledges that in this case "California has insisted that the Band share its gaming revenues as a condition to receiving authorization for additional gaming devices," but then concludes that this is simply "hard-line" negotiating for revenue sharing, not imposing a tax. Dissent at 5933. If there is a distinction between insisting on obtaining a share of Rincon's income as a non-negotiable condition of granting it a compact, and demanding a tax or "refus[ing] to enter into

---

[12]Indeed, the dissent overlooks the significance of § 2710(d)(4)'s introductory phrase: "Except for any assessments that may be agreed to under [§ 2710(d)(3)(C)(iii)." Thus, § 2710(d)(4) clearly contemplates which fees may be "agreed to," and subsequently imposed by the state, in exchange for basic gaming rights: only those described in § 2710(d)(3)(C)(iii).

[13]Under § 2710(d)(4), it is not only "taxes" that are precluded, it is *any* "tax, fee, charge, or other assessment." Even if the dissent were correct that the fees are not "taxes," we fail to see how the State's demands, which the State itself described as "annual fees," do not run afoul of this provision. The importance of the fact that the "demand" was for a "direct tax" only matters as to the question of whether the court is *required* to take the demand as evidence of bad faith under § 2710(d)(7)(B)(iii)(II), which refers to direct taxation but not the other sorts of extracted payments named in § 2710(d)(4). But under § 2710(d)(7)(B)(iii)(II), the language is clear that what matters is the State's "demand" for the tax. This shows that the analysis must focus on what states "demand," not what they may think they have the authority to "impose" in the way the dissent interprets that term.

the negotiations . . . based upon the lack of authority . . . to impose such a tax, fee, charge, or other assessment," § 2170(d)(4), it is a distinction without a difference. In either case, the state is using its power over negotiations to force Rincon to pay the State a portion of its income into the State's general fund (and not for any use for the benefit of Rincon or other tribes) in order to engage in class III gaming. If § 2710(d)(4) means anything, it means that California cannot do that—whatever one calls it.[14]

**[4]** In *Coyote Valley II,* we explained that IGRA requires courts to consider a state's demand for taxation as evidence of bad faith, not conclusive proof. 331 F.3d at 1112-13 (citing § 2710(d)(7)(B)(iii)(II)). However, "[d]epending on the nature of both the fees demanded and the concessions offered in return, such demands might, of course, amount to an attempt to impose a fee, and therefore amount to bad faith on the part of a State." *Coyote Valley II*, 331 F.3d at 1112 (internal quotation marks omitted). For the reasons described in greater detail *infra*, when the "nature of the fees" is *general fund* revenue sharing—a bald demand for payment of a tax— the State faces a very difficult task to rebut the evidence of bad faith necessarily arising from that demand. *See* § 2710(d)(3)(B)(iii)(II).

Under IGRA, the State may attempt to rebut bad faith by demonstrating that the revenue demanded was to be used for "the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities." § 2710(d)(3)(B)(ii). *See* S. Rep. No. 100-446, at 13-14,

---

[14]Even if we were to accept the dissent's interpretation of the meaning of §§ 2710(d)(3)(C) and 2710(d)(4), that would only mean that IGRA is silent on the issue of revenue sharing. The dissent takes silence as authorization, but in doing so forgets that this is a statute affecting Indian tribes. As such, we are obligated to construe ambiguities in the statute most favorably towards tribal interests, which means that we are obligated to construe the silence as a withholding of state authority to negotiate for that term. *See Bryan*, 426 U.S. at 392.

*as reprinted in* 1988 U.S.C.C.A.N. at 3083-84. The State's need for general tax revenues is not in the list. Even if "the public interest" or "financial integrity" could conceivably be construed to implicate the State's need for general funds, IGRA's purposes do not permit such a construction. Instead, those terms clearly apply to protecting the State against the adverse consequences of gaming activities. *See* § 2702; S. Rep. No. 100-446, at 13-14, *as reprinted in* 1988 U.S.C.C.A.N. at 3083-84. Moreover, construing those terms broadly in favor of the State's interests would be inconsistent with our obligation to construe IGRA most favorably towards tribal interests. *See Artichoke Joe's*, 353 F.3d at 728-30 (discussing *Montana v. Blackfeet Tribes of Indians*, 471 U.S. 759 (1985)); *see also* S. Rep. No. 100-446, at 15, *as reprinted in* 1988 U.S.C.C.A.N. at 3085 (stating Congressional intent that courts interpret any ambiguities regarding § 2710(d)(3)(B)(ii)(I) in the way most favorable to tribal interests).

Critically, the State does not even seek to justify its general fund revenue sharing demands directly under any of the factors in § 2710(d)(7)(B)(ii)(I).[15] Rather, the State relies on its interpretation of our decision in *Coyote Valley II*. The State's reliance is misplaced. *Coyote Valley II* is an exceptional case whose facts are readily distinguishable from those in this case.

## II.  *Coyote Valley II*

*Coyote Valley II* considered objections to, among other things, the RSTF and SDF provisions of the 1999 compacts.

---

[15]The State's offers include reference to its desire to limit the number of gaming devices operating in the State. Although a desire to prevent excessive proliferation of casinos and gambling devices would likely be a legitimate interest justifying State refusal to permit a tribe to expand its gaming operations, such an interest is not at issue here. The State does not rely on that interest in this case, *but cf. supra* n. 3, nor could the State credibly do so since it has shown its willingness to permit nearly unlimited gaming *if the price is right*.

We held those funds to be authorized subjects of negotiation under 25 U.S.C. § 2710(d)(3)(C)(vii) (subjects "directly related to the operation of gaming"). The SDF was clearly "directly related" to gaming because all uses of SDF funds were earmarked for gaming-related purposes. *Coyote Valley II*, 331 F.3d at 1114. The RSTF funds similarly were related to gaming because, by redistributing gaming funds from gaming to non-gaming tribes, they are entirely consistent with the IGRA goal of using gaming to foster tribal economic development. *Id.* at 1111. Notably, we expressly declined to decide if the RSTF or SDF were "taxes," because they were decidedly not "imposed" in bad faith. Rather, the tribes themselves suggested them, and were willing to pay into them in exchange for the "meaningful concession" of constitutional exclusivity. *Id.* at 1112-15.

**[5]** *Coyote Valley II* thus stands for the proposition that a state may, without acting in bad faith, request revenue sharing *if* the revenue sharing provision is (a) for uses "directly related to the operation of gaming activities" in § 2710(d)(3)(C)(vii), (b) consistent with the purposes of IGRA, and (c) not "imposed" because it is bargained for in exchange for a "meaningful concession." The State's offers in this case fail on all three prongs of that proposition.

## A. "Directly Related to the Operation of Gaming Activities"

The State asserts that, like the RSTF and SDF, its revenue sharing demands were authorized under § 2710(d)(3)(C)(vii) because they involve a subject directly related to gaming. The State misunderstands.

The State's argument that general fund revenue sharing is "directly related to the operation of gaming activities" because the money is paid out of the income from gaming activities is circular. Moreover, the very next section of the statute precludes us from interpreting § 2710(d)(3)(C)(vii) in

the way the State suggests. *See* § 2710(d)(4) (stating explicitly that states are not authorized to use negotiations to impose assessments on tribes *other than those "agreed to under paragraph (3)(C)(iii)"* (emphasis added)); *see also Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 932 (7th Cir. 2008) (describing revenue sharing agreements as being in tension with § 2710(d)(4)).

Crucially, in *Coyote Valley II* we did not conclude that § 2710(d)(3)(C)(vii) authorized the RSTF and SDF because "revenue sharing" is a subject directly related to gaming. Rather, we held that fair distribution of gaming opportunities and compensation for the negative externalities caused by gaming are subjects directly related to gaming, and the RSTF and SDF were the means chosen by the parties to the 1999 compacts to deal with those issues. *See Coyote Valley II*, 331 F.3d at 1111, 1114.

**[6]** Whether revenue sharing is an authorized negotiation topic under § 2710(d)(3)(C)(vii) thus depends on the *use* to which the revenue will be put, not on the mere fact that the revenue derives from gaming activities. General fund revenue sharing, unlike funds paid into the RSTF and SDF, has undefined potential uses. *See* Cal. Gov. Code § 16300 (providing that the "General Fund consists of money received into the treasury and not required by law to be credited to any other fund."). Therefore, payments into the general fund cannot be said to be directly related to gaming. Indeed, in *Coyote Valley II* we expressly recognized the distinction between *general fund* revenue sharing and the RSTF and SDF.[16] We noted that

---

[16]This distinction also gave the Seventh Circuit pause in *Ho-Chunk Nation*.

> While we decline to use the case before us to weigh in on [the contentious issue of revenue sharing], we do note that the terms of the revenue-sharing agreements at issue in *In re Indian Gaming* are distinct from the one contained in the Compact between the Nation and the State. In *In re Indian Gaming*, the state's use

the RSTF "provision does not put tribal money into the pocket of the State," *id.* at 1113, and reserved the question of whether the SDF would be lawful if the funds were deposited straight into the State's general fund, *id.* at 1114 n.17. Consequently, we hold that general fund revenue sharing is not "directly related to the operation of gaming activities" and is thus not an authorized subject of negotiation under § 2710(d)(3)(C)(vii). *See Cabazon Band of Mission Indians v. Wilson*, 37 F.3d 430, 435 (9th Cir. 1994) (holding that where fees go to the state's general fund, the relationship between the revenue payments and the costs incurred in regulating gaming activities is attenuated).

**[7]** Ruling out § 2710(d)(3)(C)(vii) (authorizing negotiations over subjects directly related to gaming not otherwise listed in § 2710(d)(3)(C)) makes the applicability of § 2710(d)(4) (withholding authority to impose taxes or fees other than those permitted under § 2710(d)(3)(C)(iii)) even more apparent. The State was admittedly seeking "annual fees" and objected to Rincon's suggestion that any fees be limited to § 2710(d)(3)(C)(iii) uses. That, combined with the general notion that IGRA negotiations are supposed to be limited to gaming regulation, convinces us that there is no statutory basis for authorizing tribe-state negotiations over general fund revenue sharing. *See Ho-Chunk Nation*, 512 F.3d at 932-33 (declining to decide whether general fund revenue sharing is invalid, but noting that it was apparently not a subject "con-

---

of the payments made by the tribes was heavily restricted, with all payments placed in two funds, one of which distributed gaming revenue amongst non-gaming tribes, with the other designed to fund programs to treat gambling addiction, support local agencies impacted by Indian gaming, and finance other costs directly related to gaming operations. Here, however, the Nation's payments to the State are made without any restrictions or limits on the manner in which the State may use those funds.

512 F.3d at 932 (internal citations omitted).

templated by Congress as being one of the matters tribes and the states may negotiate over under the IGRA").

## B. Consistent with the Purposes of IGRA

[8] According to § 2702, IGRA is intended to promote tribal development, prevent criminal activity related to gaming, and ensure that gaming activities are conducted fairly. In *Coyote Valley II* we construed the meaning of subjects "directly related to the operation of gaming" in § 2710(d)(3)(C)(vii) broadly to include revenue sharing because the RSTF is consistent with the plain language of § 2702 (listing tribal economic self-sufficiency as one of IGRA's purposes). *See Coyote Valley II*, 331 F.3d at 1111. By contrast, we cannot read § 2710(d)(3)(C)(vii) broadly here to include general fund revenue sharing because none of the purposes outlined in § 2702 includes the State's general economic interests. The only *state* interests mentioned in § 2702 are protecting against organized crime and ensuring that gaming is conducted fairly and honestly. § 2702(2); *see also* S. Rep. No. 100-446, at 2, 4, *as reprinted in* 1988 U.S.C.C.A.N. at 3072-73, 3075.

Because the plain language of § 2702 does not support the State's position, the State misconstrues certain statements in *Coyote Valley II* to say that the State's pursuit of its economic interests is at least *not inconsistent* with IGRA. As an initial matter, we are reluctant to inject into the statute a purpose not codified within it. *See Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). But we need not digress into that potentially complicated statutory analysis because the State clearly misinterprets *Coyote Valley II*.

The State first points to our recognition in *Coyote Valley II* that Congress acknowledged as legitimate the State's "economic interest in raising revenue for its citizens." 331 F.3d at 1115 (quoting S. REP. NO. 100-446, at 13, *as reprinted in*

1988 U.S.C.C.A.N. at 3083). The State takes this quotation out of context. The full quotation is:

> A State's governmental interests with respect to class III gaming on Indian lands include the interplay of such gaming with the State's public policy, safety, law and other interests, as well as impacts on the State's regulatory system, including its economic interest in raising revenue for its citizens. It is the Committee's intent that the compact requirement for class III not be used as a justification by a State for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes.

*Coyote Valley II*, 331 F.3d at 1115 (quoting S. Rep. No. 100-446, at 13, *as reprinted in* 1988 U.S.C.C.A.N. at 3083).

**[9]** Although a grammatical analysis of the sentence could conceivably suggest that a state's "economic interests in raising revenue for its citizens" is one of the "impacts on the State's regulatory system," such a construction would represent a distortion of the text. A more common sense approach to interpreting Congress's meaning here, as taken in *Coyote Valley II*, is to read a state's "interest in raising revenue" as being "included" as one of the "State's other interests." 331 F.3d at 1115. And in context, the "other interests" are the states's own gaming systems like the California Lottery that would, after IGRA, have to compete with Indian gaming. IGRA itself, as well as clearer statements in the legislative history, support this interpretation. *See* § 2710(d)(7)(B)(iii)(I) (listing the state's interest concerning "adverse economic impacts on existing gaming activities" among the factors relevant to a state's good faith); *see also, e.g.,* S. Rep. No. 100-446, at 1-2, 14, *as reprinted in* 1988 U.S.C.C.A.N. at 3071-72 (acknowledging the problem that States and the gaming industry may attempt to use the compact requirement to impede tribal competition). Thus, neither the statute nor the

legislative history support interpreting the phrase "other interests . . . including its economic interest in raising revenue for its citizens" to mean that states may tax tribes. In fact, all indications are to the contrary. *See* § 2710(d)(4); *supra* n.10.

The State next directs us to a similar statement from *Coyote Valley II* that "Congress . . . did not intend to require that States ignore their economic interests when engaged in compact negotiations." *Coyote Valley II*, 331 F.3d at 1115. The State's reliance on this statement is likewise misplaced. When we said that Congress did not intend for states to ignore their economic interests, we were not deciding whether states were allowed to pursue their own economic objectives affirmatively through compact negotiations. Rather, we decided only whether the State could require the tribes to pay into the SDF to cover the government's costs of dealing with the fallout of gaming. It is one thing to ask the tribes to contribute funds so the State is not left bearing the costs for gaming-related expenses; it is quite another to ask the tribes to help fix the State's budget crisis. The State is therefore incorrect that pursuit of state general economic interests is consistent with IGRA's purposes.

**[10]** As already explained, IGRA's stated purposes include ensuring that *tribes* are the *primary beneficiaries* of gaming and ensuring that gaming is protected as a means of generating *tribal revenue*. § 2702. We therefore find particularly persuasive the fact that the revenue sharing demanded in this case would result in $38 million in additional net revenue to the State compared to $2 million for the tribe. In such case, it is the State, not the tribe, that would be the "primary beneficiary" of the gaming rights under negotiation. *See Cabazon Band of Mission Indians,* 37 F.3d at 433 (explaining that where the state benefits "from the tribal gaming operation to a considerably greater extent than the [tribe, the tribe would not] be described as a 'primary beneficiary[,' and s]uch an outcome contravenes the purposes of IGRA").

### C.   "Meaningful Concessions"

Because we hold above that general fund revenue sharing is neither authorized by IGRA nor reconcilable with its purposes, it is difficult to imagine what concessions the State could offer to rebut the strong suggestion of bad faith arising from such demands. But even if it were possible to conjure up an exceptional circumstance where such would be the case, where, as here, the State demands significant taxes *and fails to offer any "meaningful concessions" in return*, a finding of bad faith is the only reasonable conclusion.

**[11]** The relevance of "meaningful concessions" arises from § 2710(d)(4). We have interpreted § 2710(d)(4) as precluding state authority to *impose* taxes, fees, or assessments, but not prohibiting states from *negotiating* for such payments where "meaningful concessions" are offered in return. *See Coyote Valley II*, 331 F.3d at 1112; *see also Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095, 1101 (9th Cir. 2006). In other words:

> [t]he theory on which [revenue sharing] payments were allowed [in *Coyote Valley II*] . . . was that the parties *negotiated* a bargain permitting such payments in return for meaningful concessions from the state (such as a conferred monopoly or other benefits). Although the state did not have *authority* to exact such payments, it could bargain to receive them in exchange for a quid pro quo conferred in the compact.

*Shoshone-Bannock*, 465 F.3d at 1101 (internal citation omitted).

Importantly, we emphasized in *Coyote Valley II* that we were not holding that "the State could have, *without offering anything in return*, taken the position that it would conclude a Tribal-State compact with [the tribe] only if the tribe agreed

to pay into the RSTF." 331 F.3d at 1112. But, "[w]here . . . a State offers meaningful concessions in return for fee demands, it does not exercise 'authority to impose' anything. Instead, it exercises its authority to negotiate, which IGRA clearly permits." *Id.* With this concept in mind, the State argues that it offered "meaningful concessions" and therefore merely exercised its authority to negotiate within the permissible bounds of IGRA.

The State's analogy fails. Unlike in *Coyote Valley II,* in which the tribes proposed the revenue sharing provisions, *see* 331 F.3d at 1113, Rincon did not suggest revenue sharing; indeed, Rincon has consistently objected to it. Additionally, the State has not offered any "meaningful concessions."

Just how "meaningful" the exclusivity provision at issue in *Coyote Valley II* was at the time of the 1999 compacts cannot be overstated. In 1999, the California constitution prohibited casino-style gaming, and the State was therefore under no obligation to allow tribes to conduct it, or even negotiate concerning it. *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250 (9th Cir. 1994). The State nonetheless negotiated the 1999 compacts with dozens of tribes, and to make the 1999 compacts fully operable, the State promoted a constitutional amendment exempting tribes, and tribes alone, from the constitutional prohibition. *Flynt*, 129 Cal. Rptr. 2d at 175-77; *see also Artichoke Joe's*, 353 F.3d at 718.

The value of a monopoly is obvious, and the value of a monopoly that cannot be altered except by the extraordinary act of further constitutional amendment is even greater. Such a benefit was well beyond anything IGRA *required* the State to offer. *See Coyote Valley II*, 331 F.3d at 1111, 1115. Specifically, IGRA provides that tribes can engage in class III gaming to the same extent as others in the state. § 2710(d)(1). Thus, IGRA only requires that states treat tribes equally. However, with the strong encouragement of the then governor, California voters gave the tribes an economic opportunity

denied to everyone else. The State's agreement (with the consent of the voters) to confer such a substantial benefit on the tribes proved that its request that more successful tribes financially assist the less fortunate ones (and that the tribes agree to cover the costs of adverse impacts) was freely negotiated. Indeed, in a rare example of generosity to tribes, the State conferred a valuable economic right on the tribes in exchange for a program under which all of the significant *benefits* of the compact were to be enjoyed by the *tribes* themselves.

**[12]** In short, we approved exclusivity as a "meaningful concession" in *Coyote Valley II* because it was *exceptionally valuable* and *bargained for*. By contrast, in the current legal landscape, "exclusivity" is not a new consideration the State can offer in negotiations because the tribe already fully enjoys that right as a matter of state constitutional law. Moreover, the benefits conferred by Proposition 1A have already been used as consideration for the establishment of the RSTF and SDF in the 1999 compact. *See Flynt*, 129 Cal. Rptr. 2d at 177. "It is elementary law that giving a party something to which he already has an absolute right is not consideration to support that party's contractual promise." *Salmeron v. United States*, 724 F.2d 1357, 1362 (9th Cir. 1983). The State asserts that it would be unfair to permit Rincon to keep the benefit of exclusivity conferred by Proposition 1A without holding the tribe to an ongoing obligation to periodically acquiesce in some new revenue sharing demand. While we do not hold that no future revenue sharing is permissible, it is clear that the State cannot use exclusivity as new consideration for new types of revenue sharing since it and the collective tribes already struck a bargain in 1999, wherein the tribes were exempted from the prohibition on gaming in exchange for their contributions to the RSTF and SDF. *Flynt*, 129 Cal. Rptr. 2d at 177.[17]

---

[17]We are aware that a few tribes have renegotiated their compacts with the State and accepted general fund revenue sharing in exchange for revised exclusivity. We express no opinion concerning the validity of those compacts. Those tribes agreed that the revised exclusivity offered,

The State offers various alternative arguments to support its claim that it offered more than illusory consideration. We find all of the State's arguments unpersuasive.

### 1. *Revised and Expanded Exclusivity*

The State first claims that it offered Rincon *revised and expanded* exclusivity, which had even greater economic value than the exclusivity originally granted by Proposition 1A.

We first note that the State never defined the precise contours of the exclusivity provision it proposed, giving us very little upon which to base a finding that the State has met its burden to show it offered a real, meaningful concession in the form of a new and improved exclusivity provision. However, we assume, as apparently the parties have done, that the revised exclusivity provision would have been similar to the one recently accepted by several other tribes, including the Pala Band of Mission Indians. The Pala Band's exclusivity provision provides that (1) "the State shall not authorize any person or entity other than an Indian tribe . . . to engage in any Gaming Activities . . . within the Tribe's core geographic market" (San Diego, Riverside, Orange, and Los Angeles Counties); and (2) if the State were to breach its obligation to ensure geographic exclusivity, "the Tribe shall have the right to enjoin such gaming" and "the right to cease the payments" due to the State. Such a revised and expanded exclusivity would be practically worthless to Rincon.

Since the passage of a constitutional amendment eliminating tribal gaming exclusivity is extremely unlikely, neither the

_____

and the financial benefits they would receive from amending their 1999 compacts, were satisfactory to them. In this case, to the contrary, the general fund revenue sharing demanded by the State in exchange for a revised exclusivity was not freely accepted by Rincon, and was demonstrably not of significant value to Rincon.

injunctive relief[18] nor the monetary[19] remedies contingent upon that event have anything more than speculative value to Rincon. In addition, Rincon did not request or desire a revised local tribal gaming exclusivity provision because such a provision— which would not apply to other tribes—would not protect Rincon against the high degree of *tribal* competition it experiences in its core geographic market. Freedom from *nontribal* competition in its core geographic market therefore provides Rincon with no significant additional economic advantages over whatever value Rincon receives from the statewide exclusivity it already enjoys.

[13] More importantly, even if there were some enhanced value in the proposed revised and expanded exclusivity provision, the calculations presented by the State's *own* expert reveal that the financial benefit to Rincon from the amendments proposed would be negligible: Rincon stood to gain only about $2 million in additional revenues compared to the State's expected $38 million. Thus, in stark contrast to *Coyote*

---

[18]Even if a constitutional amendment eliminating the nontribal casino ban were imminent, the value of the proposed injunctive remedy is questionable. We are unaware of any authority that would permit a court to enjoin a *constitutional amendment* on the grounds that it violated Rincon's *contract*.

[19]The State suggests the amended monetary remedy is superior to the monetary remedy provided under the 1999 compact because, although both compacts provide for the end of revenue sharing in the event exclusivity is lost, the Pala compact amendment permits continued gaming, whereas the 1999 compact requires termination. We are unconvinced that the continuation of gaming regime is better for Rincon than the termination regime. The Pala compact amendment would permit termination of revenue sharing if tribal exclusivity is lost in Rincon's core geographic market (which is a benefit Rincon would not enjoy in any event, *see supra* pp. 5883, 5907). The 1999 compact provides for termination whenever tribal exclusivity is lost anywhere statewide. Also, because IGRA requires the State to negotiate with Rincon in good faith, termination may not actually result in a loss of gaming—Rincon could obtain a new compact. Thus, under the 1999 termination option, Rincon has greater opportunities for essentially the same monetary relief.

*Valley II*, the relative value of the demand versus the concession here strongly suggests the State was improperly using its authority over compact negotiations to impose, rather than negotiate for, a fee. *See Coyote Valley II*, 331 F.3d at 1112. Under IGRA and *Coyote Valley II*, that is bad faith.

**[14]** Our conclusion is buttressed by the fact that the State never wavered from its general fund revenue sharing demands. We do not mean to suggest that the State is guilty of bad faith whenever it takes a "hard line" negotiating position. Indeed, in *Coyote Valley II* we upheld the State's ability to insist on certain provisions. *See Coyote Valley*, 331 F.3d at 1116 (finding that it was not bad faith for the State to insist on a particular labor standards provision). As already suggested *supra*, a "hard line" stance is not inappropriate *so long as* the conditions insisted upon are related to legitimate state interests regarding gaming and the purposes of IGRA. *See* § 2710(d)(3)(B)(iii)(I). We hold only that a state may not take a "hard line" position in IGRA negotiations when it results in a "take it or leave it offer" to the tribe to either accept non-beneficial provisions *outside the permissible scope of §§ 2710(d)(3)(C) and 2710(d)(4)*, or go without a compact. *Cf. NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 485 (1960).

## 2. *More Devices and Time*

The State's next argument is that, at the very least, it is entitled to some new consideration in exchange for giving Rincon expanded gaming rights, and the increased revenue share it requested was the only possible new consideration it could seek.

The State is correct that general contract principles dictate that new or additional consideration for a compact amendment is required. However, as already explained, IGRA does not permit the State and the tribe to negotiate over any subjects they desire; rather, IGRA anticipates a very specific

exchange of rights and obligations, defined in §§ 2710(d)(3)(C) and (d)(4). *Cf.* Cal. Const., art. XV, § 1 (limiting the permissible scope of loan contract negotiations by prohibiting, subject to penalty, negotiation for usurious interest rates).

**[15]** As held above, general fund revenue sharing is not a state public policy interest directly related to gaming and is not an authorized negotiation topic under § 2710(d)(3)(C). Therefore, gaming rights that tribes are entitled to negotiate for under IGRA, like device licensing and time, *see* § 2701(d)(3)(C)(vi),[20] cannot serve as consideration for general fund revenue sharing; the consideration must be for something "separate" than basic gaming rights. *See* Dissent at 5957 (quoting Courtney J.A. DaCosta, Note, *When "Turnabout" Is Not "Fair Play": Tribal Immunity under the Indian Gaming Regulatory Act*, 97 Geo. L.J. 515, 543-44 (2009)). In order to obtain additional time and gaming devices, Rincon may have to submit, for instance, to greater State regulation of its facilities or greater payments to defray the costs the State will incur in regulating a larger facility. *See* 25 U.S.C. § 2710(d)(3)(C)(i, iii). Rincon need not, however, submit to demands that it assist the State in addressing its budget crisis.

We are further influenced by the fact that the Department of the Interior, the executive agency charged with approving gaming compacts, also interprets IGRA in this way. As stated by the Assistant Secretary of Indian Affairs,

> It is the position of the Department to permit revenue-sharing payments in exchange for *quantifiable* economic benefits *over which the State is not required to negotiate under IGRA*, such as substan-

---

[20]"[L]icensing issues under clause vi may include agreements on days and hours of operation, wage and pot limits, types of wagers, and size and capacity of the proposed facility." S. Rep. No. 100-446, at 13, *reprinted in* 1988 U.S.C.C.A.N. at 3084.

tial exclusive rights to engage in Class III gaming activities. We have not, nor are we disposed to, authorize revenue-sharing payments in exchange for compact terms that are routinely negotiated by the parties as part of the regulation of gaming activities, such as duration, number of gaming devices, hour of operation, and wager limits.[21]

To hold otherwise would effectively mean that states could put gaming rights "up for sale."[22] That would be inconsistent with IGRA's spirit, and its express refusal to allow states to use their right to engage in compact negotiations as a means to extract fees. § 2710(d)(4).

### 3.  *"Exclusive Gaming Rights"*

Next, the State argues that the value of its offers during compact negotiations should be analyzed as a whole, not piecemeal. Specifically, the State contends that we should evaluate its offer not simply by considering the value of the exclusivity provision itself, but rather the value of the entire bundle of "exclusive gaming rights" that Rincon would obtain under an amended compact. Viewing its offer in this way, the State contends it negotiated in good faith.

---

[21]We take judicial notice of this statement by the Assistant Secretary pursuant to Federal Rule of Evidence 201.

[22]Congress considered amending IGRA in 2003, although no definitive action has since been taken. During the discussions, a representative from the Department of the Interior stated to Congress that the Department was seriously concerned about having to make decisions about the legitimacy of revenue sharing agreements, and wanted Congress to give it clear guidance so that it could avoid seeing "more and more of these revenues going to the States under these compacts." S. Hrg. 108-475, at 33-34 (statement of Acting Deputy Assistant Sec'y for Policy and Econ. Dev. for the Dep't of the Interior Skirbine). The Department representative summarized, "we do not believe it was the intent of IGRA to have all the provisions up for sale." *Id.* at 33.

If there is a meaningful distinction between "exclusivity" and "gaming rights" as stand alone terms and "exclusive gaming rights," it is too minuscule to see. Because exclusivity exists independent of the current compact negotiations, the *negotiations* concern only the extent of gaming rights, which are, by nature as a result of California constitutional law, exclusive. Were we to accept the State's view that whenever it negotiates with a tribe, it offers "meaningful concessions" because the gaming rights offered will, as a matter of law, be exclusive, we would effectively be holding that, as a matter of law, the State is entitled to insist on significant general fund revenue sharing whenever a tribe wants to renegotiate basic terms. We reject the State's view. As explained in Part II.C.2, *supra*, IGRA entitles tribes to negotiate for basic class III gaming rights without being forced to accept revenue sharing.

[16] Further, we disagree that the State makes "meaningful concessions" whenever it offers a bundle of rights more valuable than the status quo.[23] As previously explained, IGRA endows states with limited negotiating authority over specific items. Accepting the State's "holistic" view of negotiations would permit states to lump together proposals for taxation, land use restrictions, and other subjects along with IGRA

---

[23]The dissent takes this statement out of context. At oral argument, the State argued that as long as the tribe would be better off with the new compact concerning "exclusive" gaming rights than the tribe was under its old one, the State could demand revenue sharing as its reward. Although we do not inquire into the adequacy of consideration as a general rule, when the consideration must necessarily be divided into two parts—that which IGRA contemplates and that which is outside of IGRA—we cannot bundle the rights being negotiated and compare the whole to the status quo as our method for determining whether the concessions are meaningful. The consideration in exchange for the revenue sharing must be independently meaningful in comparison to the status quo, i.e. not illusory (or illegal) if standing alone.

class III gaming rights. Such a construction of IGRA would violate the purposes and spirit of that law.[24] *See supra*, n.10.

## III. Other Evidence of Good Faith

The State raises one final argument in support of its position. Specifically, the State contends that it genuinely believed its revenue sharing demands were authorized by *Coyote Valley II,* approved by the Department of the Interior, and fair because other tribes had accepted them. The State therefore urges us to find that its demands, even though herein held improper under IGRA, were nonetheless made in good faith.

[17] IGRA does not provide express guidance about whether good faith is to be evaluated objectively or subjectively. However, we are influenced by the factors outlined in § 2710(d)(7)(B)(iii), which lend themselves to objective analysis and make no mention of unreasonable beliefs. Further, the structure and content of § 2710(d) make clear that the function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis, not to embroil the parties in litigation over their subjective motivations. We therefore hold that good faith should be evaluated objectively based on the record of negotiations, and that a state's subjective belief in the legality of its requests is not sufficient to rebut the inference of bad faith created by objectively improper demands.[25] *See Mashantucket*

---

[24]"I hope the States will be fair and respectful of the authority of the tribes in negotiating these compacts and not take unnecessary advantage of the requirement for a compact." 134 Cong. Rec. at S12651 (statement of Sen. Inouye).

[25]Interestingly, on the question of the scope of discovery permissible in IGRA negotiations, the State has taken the position that good faith should be proved based on the objective course of negotiations. *See also Fort Independence Indian Cmty. v. California*, No. Civ. S-08-432, 2009 WL 1283146, at *3 (E.D. Cal. May 7, 2009) (agreeing with the State that good faith should be based on objective factors). The State cannot have it both ways. If the State wants to avoid discovery and limit review of good faith to the official record of negotiations, the State cannot defend itself on the good faith question by claiming its objectively improper demands were made with an innocent intent.

*Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1033 (2d Cir. 1990) ("The statutory terms are clear, and provide no exception for sincere but erroneous legal analyses.").

**[18]** Here, the State's belief that IGRA permitted the revenue sharing it sought was objectively unreasonable. IGRA expressly condemns state attempts to compel fees for purposes other than those specified in § 2710(d)(3)(C)(iii). The State does not even attempt to fit its general fund revenue sharing demand within § 2710(d)(3)(C)(iii). While *Coyote Valley II* held that § 2710(d)(3)(C)(vii) might also authorize revenue sharing, that case involved exceptional circumstances and turned on the specialized, limited uses of the revenue. As explained *supra*, the rationale for permitting revenue sharing under 2710(d)(3)(C)(vii) in *Coyote Valley II* is not present in this case, and the State was unreasonable to rely on *Coyote Valley II* for propositions not decided, or expressly reserved. *See supra* pp. 5897-99. Further, the Department of the Interior has frequently noted its concerns about the legitimacy of general fund revenue sharing. *See, e.g., supra* nn. 21 & 22 and accompanying text; *New Mexico v. Pueblo of Pojoaque*, 30 F. App'x 768, 768 (10th Cir. 2002) (order); *Mescalero Apache Tribe v. New Mexico*, 131 F.3d 1379, 1382 n.2 (10th Cir. 1997); *Pueblo of Sandia v. Babbitt*, 47 F. Supp. 2d 49, 51 (D.D.C. 1999). The Department of the Interior has approved compacts with general fund revenue sharing provisions agreed to by other California tribes, but has done so reluctantly, and only after the tribes themselves confirmed the desirability of the amendments.[26] Often, the Secretary simply permits compacts with revenue sharing provisions to go into

---

[26]In approving the compact amendments referenced by the State, the Secretary noted that "the Department has sharply limited the circumstances under which Indian tribes can make direct payments to a State for purposes other than defraying the costs of regulating gaming activities," but agreed to approve the compacts at issue because the tribes themselves had confirmed that the exclusivity provision constituted "meaningful geographical exclusivity" and that the "amount of payment to the State [was] appropriate in light of the exclusivity right conferred."

effect "only to the extent they are consistent with IGRA," thus leaving open the precise question at issue. The State therefore could not reasonably have relied on the Department of the Interior's approval of certain other compacts as proof that its demands to Rincon were lawful. This is especially true since IGRA anticipates that, even if some tribes agree to a waiver of their rights not to be taxed by a state, such a waiver cannot be a basis for the State expecting the same from Rincon. *See Shoshone-Bannock*, 465 F.3d at 1101-02; S. Rep. No. 100-446, at 5, *as reprinted in* 1988 U.S.C.C.A.N. at 3075-76 (explaining that "it is the Committee's intention that to the extent tribal governments elect to relinquish rights in a tribal-State compact that they might have otherwise reserved, the relinquishment of such rights shall be specific to the tribe so making the election, and shall not be construed to extend to other tribes").

**[19]** The State's demand for 10-15% of Rincon's net win, to be paid into the State's general fund, is simply an impermissible demand for the payment of a tax by the tribe. *See* § 2710(d)(3)(B)(iii); § 2710(d)(4). None of the State's arguments suffices to rebut the inference of bad faith such an improper demand creates.

In so holding, we are mindful that many states, and especially California, are currently writhing in the financial maw created by the clash of certain mandatory state expenditures at a time when state revenues have plummeted from historic levels. However, we are also keenly aware of our nation's too-frequent breach of its trust obligations to Native Americans when some of its politically and economically powerful citizens and states have lusted after what little the Native Americans have possessed. In developing IGRA, Congress anticipated that states might abuse their authority over compact negotiations to force tribes to accept burdens on their sovereignty in order to obtain gaming opportunities. *See, e.g.,* 134 Cong. Rec. S12643-01, at S12651 (1988) (Statement of Sen. Evans)*; see also* S. Rep. No. 100-446, at 33 (statement

of Sen. John McCain), *reprinted in* 1988 U.S.C.C.A.N. at 3103. That is why the good faith requirement exists, and why IGRA condemns state taxation demands.

## CONCLUSION

**[20]** We AFFIRM the district court's finding that the State of California negotiated with Rincon in bad faith by conditioning its agreement to expand Rincon's class III gaming rights on Rincon's agreement to pay a percentage of its revenues to the State's general fund. The district court's order compelling the parties to reach a compact or submit their best offers to a mediator pursuant to § 2710(d)(7) is effective forthwith.

**AFFIRMED**.

---

BYBEE, Circuit Judge, dissenting:

In 1999, the Rincon San Luiseno Band of Mission Indians ("the Band") negotiated a compact with the State of California to operate a casino—known as Harrah's Rincon Hotel & Casino—in San Diego County. Under the terms of that compact, the Band was authorized to operate up to 1,600 Nevada-style gaming devices. The compact remains in effect until 2020. In 2003, the Band requested that California renegotiate the compact so that the Band could increase the number of devices from 1,600 to 2,500. Throughout an exchange of proposals, the State demanded that the Band contribute a percentage of its gaming revenues to the State's general fund. The negotiations failed, resulting in no increase in gaming devices for the Band and no revenues for the State. Unhappy with the course of the negotiations, the Band brought suit under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, claiming that the State had negotiated in bad faith and requesting mandatory mediation.

In *In re Indian gaming Related Cases ("Coyote Valley II")*, we held that when "a State offers meaningful concessions in return for fee demands . . . . it exercises its authority to negotiate, which IGRA clearly permits." 331 F.3d 1094, 1112 (9th Cir. 2003). Going well beyond anything we said in *Coyote Valley II*, the majority holds (1) the State's demand for "general fund revenue sharing [is] a bald demand for payment of a tax," Maj. Op. at 5896 (emphasis omitted); (2) "general fund revenue sharing . . . is . . . not an authorized subject of negotiation" under IGRA, *id.* at 5900; and therefore (3) the State's "demand for payment of a tax [is] . . . evidence of [the State's] bad faith," *id.* at 5896. The majority concludes that the State has negotiated in bad faith and orders the parties to amend their compact or submit to mediation.

I respectfully disagree with all of these propositions. First, we have long held that the power to tax is defined by the sovereign's power to *impose* the tax. California has exercised no such power here. The majority has confused California's hardball negotiations with the taxing power. California has not claimed any authority to tax the Band and, if these negotiations fail, the Band will not have added one penny to the State's coffers. Second, IGRA is silent on the particular question whether states and tribes may include revenue sharing in their negotiations. But the Act provides that the parties "may include provisions relating to . . . any other subjects that are directly related to the operation of gaming activities," 25 U.S.C. § 2710(d)(3)(C)(vii), and we held in *Coyote Valley II* that the parties could negotiate over "fee demands." The majority now holds that such fee demands cannot include general revenue sharing *derived* from the operation of gaming activities, but are limited to fees spent on the regulation of gaming alone. This restriction takes from the State its primary incentive in negotiating gaming compacts with the tribes. Third, even if I thought California had imposed a tax on the Band, I do not believe the State has negotiated in bad faith. By its constitution, California has granted the tribes the exclusive right to offer Nevada-style gaming in the State. That

structure puts the State and the Band into a bilateral monopoly situation in which each side has powerful economic incentives to negotiate at the margins. At the least, the State has offered the Band a more than fifty percent increase in the number of authorized gaming machines and a twenty-five year extension on its contract on terms comparable to other tribes with California compacts. The offered terms are well within the range of good faith negotiations. Of course, whether the Band should accept the State's offer is a very different question from whether the State has negotiated in bad faith. But absent the majority's intervention, both sides would have strong incentives to continue negotiations.

The impact of the majority's decision may not be readily apparent from its opinion, but the holding that California has negotiated in bad faith because its demand for general revenue sharing is a tax and not an authorized subject of negotiation does not just upset the apple cart—it derails the whole train. If the majority is correct, then there is nothing for California to do but to authorize whatever devices the Band wants. The Band wins. Everything.

Moreover, the damage is not confined to the Rincon Band. The revenue sharing provision that the majority strikes from the negotiations is found in fifteen other compacts that California has recently negotiated or renegotiated with tribes. All of those compacts were approved by the Secretary of the Interior. Those tribes now have a powerful argument that their compacts must be renegotiated (again) in light of the majority's decision. The damage, moreover, is not confined to our circuit. Every state that has negotiated a compact in recent years—including Connecticut, Florida, Michigan, New York, New Mexico, Oklahoma, and Wisconsin—has negotiated a similar revenue sharing provision, one that was also approved by the Secretary. The result is going to be chaos as tribe after tribe seeks to reopen negotiations concluded and duly approved. Nothing in IGRA compels our intervention in these negotiations.

I respectfully dissent.

I

Since the framing of the Constitution, Indian tribes have occupied a "unique legal posture . . . in relation to the federal government." William C. Canby, Jr., American Indian Law 1 (5th ed. 2009). "[T]ribes are independent entities with inherent powers of self-government," but "the independence of the tribes is subject to exceptionally great powers of Congress," which "has a responsibility for the protection of the tribes and their properties . . . ." *Id.* at 1-2. The presence of fifty sovereign states complicates the relationship: "the power to deal with and regulate the tribes is wholly federal; the states are excluded unless Congress delegates power to them." *Id.* at 2. "[I]n assessing state regulation that does not involve taxation," the Supreme Court has taken a functional approach to try to "balance[ ] federal, state, and tribal interests." *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995). However, state taxation of Indians or Indian tribes, where a "State attempts to levy a tax directly on an Indian tribe or its members inside Indian country," has produced, "instead of a balancing inquiry, a more categorical approach." *Id.* at 458 (quotation marks omitted).[1]

---

[1]Like the unique relationship between Congress and the tribes, *see* U.S. Const. art. I, § 8, cl. 3 (giving Congress the power "[t]o regulate commerce with foreign nations, and among the several states, and with the Indian Tribes"), the special tax immunity enjoyed by Indian tribes has its roots in the Constitution, *see id.* art. I, § 2, cl. 3 ("Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and *excluding Indians not taxed*, three fifths of all other Persons." (emphasis added)); *see also id.* amend. XIV, § 2 ("Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.").

The Supreme Court's approach to tribal sovereign immunity has evolved over time. As Chief Justice Marshall explained in *Worcester v. Georgia*, 31 U.S. 515 (1832), at the time of the framing there was a "universal conviction that the Indian nations possessed a full right to the lands they occupied, until that right should be extinguished by the United States, with their consent: that their territory was separated from that of any state within whose chartered limits they might reside, by a boundary line, established by treaties: that, within their boundary, they possessed rights with which no state could interfere: and that the whole power of regulating the intercourse with them, was vested in the United States." *Id.* at 560.[2] By the late twentieth century, the Supreme Court had "reject[ed] . . . the broad assertion that the Federal Government has exclusive jurisdiction over the Tribe for all purposes and that the State is therefore prohibited from enforcing its revenue laws against any tribal enterprise whether the enterprise is located on or off tribal land" in favor of "more individualized treatment of particular treaties and specific federal statutes, including statehood enabling legislation, as they, taken together, affect the respective rights of States, Indians, and the Federal Government." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 147-48 (1973) (quotation marks omitted) (citing *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164 (1973). But "[e]ven so, in the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it," the Supreme Court found "no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation," holding that "such taxation [wa]s not permissible absent congressional consent." *Id.* at 148.

---

[2] "The source of federal authority over Indian matters has been the subject of some confusion, but it is now generally recognized that the power derives from federal responsibility for regulating commerce with Indian tribes and for treaty making." *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 172 n.7 (1973) (citing U.S. Const. art. I, § 8, cl. 3; *id.* art. II, § 2, cl. 2 (additional citations omitted)).

In short, "[a]bsent cession of jurisdiction or other federal statutes permitting it . . . a State is without power to tax reservation lands and reservation Indians." *Okla. Tax Comm'n*, 515 U.S. at 458 (quotation marks omitted). A tax levied directly on persons or property is known as a "direct tax," and "Indian tribes, like the Federal Government itself, are exempt from direct state taxation and . . . this exemption is lifted only when Congress has made its intent to do so unmistakably clear." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 183 n.14 (1989) (quotation marks omitted).

II

Against this intricate backdrop of federal-state-tribal relations, tribal gaming emerged.

A

In the 1970s, bingo halls began to open on tribal land, often in derogation of state gambling laws. *See Coyote Valley II*, 331 F.3d at 1095; *Flynt v. Cal. Gambling Control Comm'n*, 129 Cal. Rptr. 2d 167, 172-73 (Ct. App. 2002). When states attempted to regulate or shut down tribal bingo halls, the tribes argued that their sovereign status immunized them from state gambling regulation. *Id.*; *see Barona Group of Captain Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185 (9th Cir. 1982); *Seminole Tribe v. Butterworth*, 658 F.2d 310, 312 (5th Cir. 1981), *cert. denied*, 455 U.S. 1020 (1982); *Oneida Tribe of Indians v. Wisconsin*, 518 F. Supp. 712 (W.D. Wis. 1981). Tribal bingo halls—and state attempts to regulate them—attracted national attention as the stakes and profit from these establishments skyrocketed. *See* James Coates, *U.S. fears big-money bingo will draw mob to Indian tribes*, CHI. TRIB., Dec. 1, 1985, at 4; Howard LaFranchi, *States vs. Indian Bingo*, CHRISTIAN SCI. MONITOR, Feb. 24, 1986, at 3; Lenore Look, *Hearing to Air Complaints on Misuse of Tribes' Bingo Revenue*, L.A. TIMES, May 24, 1985, at A1; Iver Peterson,

*Bingo That Doesn't Get Any Bigger*, N.Y. TIMES, Nov. 3, 1985, at E4.

California was right in the middle of the bingo battles: in the mid-1980s, the State attempted to enforce its gambling statutes against tribes operating bingo halls within its borders, and the tribes responded by filing suit in federal court, arguing that the State did not have regulatory jurisdiction over tribal lands. *Coyote Valley II*, 331 F.3d at 1095. In response, the State argued that Congress had expressly consented to the State's exercise of jurisdiction over tribal gaming activities in Public Law 83-280, which granted five states, including California, jurisdiction over criminal violations on tribal land. Pub. L. 83-280 (Aug. 15, 1953), *codified as amended at* 18 U.S.C. § 1162, 28 U.S.C. § 1360, and 25 U.S.C. §§ 1321-1326; *see Coyote Valley II*, 331 F.3d at 1095. In 1987, the Supreme Court ruled in favor of the tribes, holding that Public Law 83-280 did not expressly authorize state jurisdiction over activities on tribal land that were regulated, rather than wholly prohibited, under state law. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 210-12 (1987). Since "California regulate[d] rather than prohibit[ed] gambling in general and bingo in particular," the State's attempts to regulate tribal bingo were not authorized by Public Law 280, *id.* at 211, and "[s]tate regulation would impermissibly infringe on tribal government," *id.* at 222.

Legislation concerning tribal gaming had percolated in Congress for several years prior to *Cabazon*, but prior to the Court's decision in that case, it was unclear that congressional action was required to allow state regulation of tribal gaming. The *Cabazon* decision answered this question in the affirmative, and the year after *Cabazon*, Congress passed the Indian Gaming Regulatory Act, Pub. L. 100-497 (Oct. 17, 1988), *codified at* 25 U.S.C. § 2701 *et. seq.*

B

In IGRA, Congress created a "cooperative federalis[t]" framework that "balance[d] the competing sovereign interests

of the federal government, state governments and Indian tribes, by giving each a role in the regulatory scheme." *Coyote Valley II*, 331 F.3d at 1096 (quoting *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1092 (E.D. Cal. 2002)). Recognizing that different types of gaming presented different regulatory burdens, IGRA outlined three classes of gaming and gave the respective sovereigns differing degrees of regulatory authority with respect to each gaming class. States were given very little regulatory authority over what Congress deemed class I and class II gaming—consisting of social games with prizes of minimal value, 25 U.S.C. § 2703(6), and bingo and certain non-banked card games, *id.* §§ 2703(7)(A)-(B), respectively. States could not regulate class I gaming on tribal lands at all, *id.* § 2710(a)(1), and if a state allowed any class II gaming within its borders, it had to allow tribes to conduct such class II gaming on tribal lands subject only to tribal and federal regulation, *id.* §§ 2710(a)(2) and 2710(b)(1)(A)-(B). By contrast, class III gaming—consisting of banked card games such as blackjack and baccarat, slot machines and other electronic gaming machines, and other Nevada-style gaming activities, *id.* §§ 2710(b)(7)(B) and 2710(b)(8)—was "subject to a greater degree of federal-state regulation than either class I or class II gaming." *Coyote Valley II*, 331 F.3d at 1097. In particular, IGRA allowed class III gaming activities on tribal lands only (1) "in a State that permits such gaming for any purpose by any person, organization, or entity," 25 U.S.C. § 2710(d)(1)(B), and (2) "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under [25 U.S.C. § 2710(d)(3) *et seq.*] that is in effect," *id.* § 2710(d)(1)(C).

IGRA's compact requirement represented a unique approach to a unique situation. The prospect of class III gaming on tribal lands implicated important—and potentially divergent—interests of two sovereign parties, states and tribes. At the same time, however, Congress recognized that the respective interests of states and tribes with respect to class III gaming were neither identical nor mutually exclu-

sive. Faced with this situation, Congress came up with a solution as old as the free market itself: allow states and tribes to *bargain* over the terms of their class III gaming relationship. As the Senate Report for IGRA explained:

> In the Committee's view, both State and tribal governments have significant governmental interests in the conduct of class III gaming. States and tribes are encouraged to conduct negotiations within the context of the mutual benefits that can flow to and from tribe *[sic]* and States. This is a strong and serious presumption that must provide the framework for negotiations. A tribe's governmental interests include raising revenues to provide governmental services for the benefit of the tribal community and reservation residents, promoting public safety as well as law and order on tribal lands, realizing the objectives of economic self-sufficiency and Indian self-determination, and regulating activities of persons within its jurisdictional borders. A State's governmental interests with respect to class III gaming on Indian lands include the interplay of such gaming with the State's public policy, safety, law and other interests, as well as impacts on the State's regulatory system, including its economic interest in raising revenue for its citizens. It is the Committee's intent that the compact requirement for class III not be used as a justification by a State for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes.

S. Rep. No. 100-446, at 13 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 3071, 3083.

At the same time, Congress recognized that it was not drafting IGRA against a blank legal slate. The Senate Report acknowledged the "long [ ] and well-established principle of

Federal-Indian law as expressed in the United States Constitution, reflected in Federal statutes, and articulated in decisions of the Supreme Court, that unless authorized by an act of Congress, the jurisdiction of State governments and the application of state laws do not extend to Indian lands." *Id.* at 5, *reprinted in* 1988 U.S.C.C.A.N. at 3075. "Consistent with these principles, the Committee . . . developed a framework for the regulation of gaming activities on Indian lands which provide[d] that in the exercise of its sovereign rights, unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress w[ould] not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities." *Id.* at 6, *reprinted in* 1988 U.S.C.C.A.N. at 3075. "The mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to activities conducted on Indian land [wa]s a tribal-State compact." *Id.* at 6, *reprinted in* 1988 U.S.C.C.A.N. at 3076.

In enacting IGRA, Congress was not only aware of the complicated legal framework governing state-tribal relations, but was legislating directly in response to a Supreme Court decision in this area *Cabazon Band*. Recognizing the special consideration given to tribal immunity against *taxation* by the states absent congressional consent, Congress took care to ensure that IGRA's compact requirement did not "[lift] the Indians' exemption from state taxes." *Cabazon Band*, 480 U.S. at 215 n.17. Congress did this in two ways: First, Congress explained that IGRA's compact provision did not constitute the "express congressional authorization" required under *Cabazon Band* and related precedents to abrogate tribal immunity to taxation, stating that "[e]xcept for any assessments that may be agreed to under paragraph (3)(C)(iii) of this subsection, nothing in this section shall be interpreted as *conferring* upon a State or any of its political subdivisions *authority to impose* any tax, fee, charge, or other assessment *upon an Indian tribe* . . . to engage in a class III activity." 25

U.S.C. § 2710(d)(4) (emphases added). Second, recognizing that states might demand that tribes abrogate their immunity to direct taxation as part of compact negotiations, Congress declared such a practice to be evidence of bad faith on behalf of the state making the demand. *See id.* § 2710(d)(7)(B)(iii)(II) (a court "shall consider any demand by the State for *direct taxation of the Indian tribe or of any Indian lands* as evidence that the State has not negotiated in good faith").

Providing a proper context to 25 U.S.C. §§ 2710(d)(4) and (d)(7)(B)(iii)(II) clarifies the congressional intent behind these provisions. These subsections are not concerned with States *negotiating* a "piece of the pie" with respect to class III gaming revenue: Congress expressly authorized State "assessment . . . of [class III gaming] activities," 25 U.S.C. § 2710(d)(3)(C)(iii), used deliberately narrow language in subsections (d)(4) and (d)(7)(B)(iii)(II), and, after recognizing that "[a] state's governmental interests with respect to class III gaming on Indian lands include . . . impacts on the State's regulatory system, *including its economic interest in raising revenue for its citizens*," encouraged States and tribes "to conduct negotiations within the context of the mutual benefits that can flow to and from tribe *[sic]* and states." S. REP. NO. 100-446, at 13, *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083 (emphasis added). Rather, subsections (d)(4) and (d)(7)(B)(iii)(II) are concerned with the possibility that a State might use IGRA as pretext to *impose* taxes directly on an Indian tribe or its lands, where the tribe would otherwise be immune, *see* S. REP. NO. 100-446, at 14, *reprinted in* 1988 U.S.C.C.A.N. 3071, 3084 ("The Committee . . . view[s] the concession to any implicit tribal agreement to the application of State law as unique and does not consider such agreement to be precedent for any other incursion of State law onto Indian lands."), as well as the converse—using the threat of direct taxation to discriminate against tribes in favor of private gaming interests, *see id.* at 13 ("It is the Committee's intent that the compact requirement for class III gaming not be used as a justification by a State for excluding Indian tribes

from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes.").

In sum, §§ 2710(d)(4) and (d)(7)(B)(iii)(II) were motivated *not* by a concern that states might generate revenue from class III gaming conducted on Indian lands—indeed, the legislative history of IGRA contemplates this very eventuality, S. REP. NO. 100-446, at 13, *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083 (recognizing a State's "economic interest in raising revenue for its citizens")—but by a concern that states might use IGRA and the promise of class III gaming to *otherwise impose taxes on Indian tribes and their land*.

The majority treats §§ 2710(d)(4) and (d)(7)(B)(iii)(II) as though these sections delegate to Article III judges the responsibility of conducting a broad, standardless review of the overall "fairness" of negotiated compacts, but this is simply not the case. As explained above, §§ 2710(d)(4) and (d)(7)(B)(iii)(II) were limited, carefully-worded responses to specific issues arising from the background of tribal-state relations under the Constitution. Moreover, IGRA already assigns to the Secretary of the Interior—the government official "charg[ed by Congress] . . . with broad responsibility for the welfare of Indian tribes," *Udall v. Littell*, 366 F.2d 668, 672 (D.C. Cir. 1966) (Burger, J.), and who owes "the Indians . . . [a] duty of care and protection," *Rainbow v. Young*, 161 F. 835, 838 (8th Cir. 1908) (Van Devanter, J.); *see* 25 U.S.C. § 2 (Secretary of the Interior, through the Commissioner of Indian Affairs, "shall . . . have the management of all Indian affairs and of all matters arising out of Indian relations"); 43 U.S.C. § 1457 (charging the Secretary of the Interior "with the supervision of public business relating to . . . Indians")— broad authority to approve or disapprove tribal-state compacts, and enumerates specific standards against which a tribal-state compact is to be reviewed by the Secretary. *See* 25 U.S.C. § 2710(d)(3)(B) ("[A] Tribal-State compact . . . shall take effect only when notice of approval by the Secretary [of

the Interior] of such compact has been published by the Secretary in the Federal Register."); *id.* § 2710(d)(8) *et seq.* ("The Secretary may disapprove a [Tribal-State] compact . . . only if such compact violates—(i) any provision of this chapter, (ii) any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or (iii) the trust obligations of the United States to Indians.").

C

As we explained in *Coyote Valley II*, "[t]he passage of IGRA did not end the fight over Indian gaming in California." 331 F.3d at 1098. After IGRA's passage, numerous California tribes sought to negotiate class III gaming compacts with the State. *Id.* Among the class III games the tribes sought to offer were banked card games and slot machine-like electronic gaming machines. However, at the time these particular games were not permitted under California law, even though California permitted other forms of class III gaming such as non-electronic keno and lotto. *Id.*; *see Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1257-58 (9th Cir. 1994). During the Administration of Governor Pete Wilson, the State refused to negotiate with the tribes with respect to banked card games and slot machine-like gaming machines, arguing that under 25 U.S.C. § 2710(d)(1)(B) ("class III gaming shall be lawful on Indian lands only if such activities are . . . located in a State that permits such gaming for any purpose by any person, organization, or entity"), a state need only negotiate with tribes with respect to class III games and devices otherwise allowed under state law. *Coyote Valley II*, 331 F.3d at 1098. In *Rumsey*, we agreed with the State, holding that "IGRA does not require a state to negotiate over one form of Class III gaming simply because it has legalized another, albeit similar form of gaming. . . . In other words, a state need only allow Indian tribes to operate games that others can operate, but need not give tribes what others cannot have." 64 F.3d at 1258.

For the next few years, numerous tribes continued to offer class III gaming activities that were categorically prohibited under California state law; in response, the Wilson administration refused to negotiate compacts covering class III games the State *did* permit. *Id.* at 1099. In 1998, a coalition of California tribes drafted a ballot proposition that would amend state law—but not the State Constitution—to require the State to enter into compacts with Indian tribes that allowed otherwise-illegal class III gaming activities including banked card games and slot machines. *Id.* at 1100. This ballot proposition passed by a wide margin, but was ruled unconstitutional by the California Supreme Court, as the California Constitution provided that the "Legislature has no power to authorize, and shall prohibit casinos of the type currently operating in Nevada and New Jersey." CAL. CONST. art. IV, § 19(e); *see Hotel Employees & Rest. Employees Int'l Union v. Davis*, 981 P.2d 990, 994 (Cal. 1999).

In early 1999—while *Hotel Employees* was pending before the California Supreme Court, but prior to the court's decision in that case—the administration of newly-elected Governor Gray Davis reversed the Wilson Administration's non-negotiation policy and began compact negotiations with tribes regarding class III gaming that would include banked card games and slot machines. *Coyote Valley II*, 331 F.3d at 1102-03. After the *Hotel Employees* decision was filed in August 1999, the Davis Administration proposed an amendment to Article IV, Section 19 of the California Constitution that would exempt tribal gaming from the prohibition on Nevada-style casinos, subject to the requirement that class III gaming be conducted pursuant to a tribal-state compact; this proposed amendment was to be placed on the ballot in March 2000 as Proposition 1A. *Id.* at 1103 & n.11. Also in the late summer of 1999, the United States Department of Justice announced that it planned to proceed with enforcement actions against California tribes engaged in unauthorized class III gaming if those tribes did not enter into compacts with the State before October 13, 1999. *Id.* at 1103.

The Davis Administration and the tribes engaged in compact negotiations throughout August and September of 1999. The basic quid pro quo in these 1999 negotiations was as follows: First, the State offered the tribes the exclusive right—with this exclusivity embodied in a constitutional amendment, *see* CAL. CONST. art. 4, § 19(f)—to conduct Nevada-style class III gaming, including house-banked slot machines and blackjack, *see* 1999 Tribal-State Gaming Compact ("1999 Compact") § 12.4, http://www.cgcc.ca.gov/enabling/tsc.pdf (last visited Apr. 6, 2010). In exchange, the tribes offered a variety of concessions including, as relevant here, (1) limits on the number of class III gaming devices a tribe could operate, *see id.* § 4.3; and (2) "Revenue Distribution," *see id.* § 5.0-5.3, under which a gaming tribe was required to remit to the State a percentage of its average net win from class III gaming devices in operation on September 1, 1999, to be deposited in a "Special Distribution Fund" ("SDF"). *Id.* § 5.1(a).[3] Under the 1999 Compact's "Revenue Distribution" provisions,

> [t]he State's share of the Gaming Device revenue [was to] be placed in the Special Distribution Fund, available for appropriation by the Legislature for the following purposes: (a) grants, including any administrative costs, for programs designed to address gambling addiction; (b) grants, including any administrative costs, for the support of state and local government agencies impacted by tribal government gaming; (c) compensation for regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the imple-

---

[3]The 1999 compact also provided for revenue sharing between gaming and non-gaming tribes through the creation of a "Revenue Sharing Trust Fund" ("RSTF"). *Id.* § 4.3.2 *et seq.* The RSTF provision required gaming tribes to pay, on a quarterly basis, a per-device annual fee into the RSTF for distribution to non-gaming tribes in California. *Id.* § 4.3.2.2(2). The RSTF provisions of the 1999 Compact were solely directed at gaming and non-gaming tribes—"[i]n no event [was] the State's General Fund [ ] obligated to make up any shortfall or pay any unpaid claims." *Id.* § 4.3.2.1(b).

mentation and administration of the Compact; (d) payment of shortfalls that may occur in the Revenue Sharing Trust Fund; and (e) any other purposes specified by the Legislature.

*Id.* § 5.2. If a tribe failed to timely pay its required share of gaming device revenues to the State, the tribe would be charged interest "in addition to any other remedies the State m[ight] have," *id.* § 5.3(b); if "more than two quarterly contributions" by the tribe were overdue, the tribe would be prohibited from conducting class III gaming, *id.* § 5.3(e).

On September 10, 1999, 57 tribes, including the Band, signed letters of intent to enter the 1999 Compact. In March 2000, Proposition 1A was ratified by California voters. Two months later, the United States Secretary of the Interior approved the Tribal-State compacts entered into between the State and 60 tribes, including the Band. *Coyote Valley II*, 331 F.3d at 1107; *see* 65 Fed. Reg. 31189 (May 16, 2000). The Band currently operates its "Harrah's Rincon" casino pursuant to the 1999 Compact. Under this compact, which does not expire until 2020, the Band is authorized to operate 1600 gaming devices. Notably, because the Band operated fewer than 200 gaming devices on September 1, 1999, it is not required to make—and never has made—revenue sharing payments to the SDF under its existing compact. *See* 1999 Compact § 5.1(a) ("The Tribe shall make contributions to the Special Distribution Fund . . . only with respect to the number of Gaming Devices operated by the Tribe on September 1, 1999.").

By 2003, California was awash in debt and faced a $38 billion dollar budget deficit. *See generally* Mark Simon, *Recall Election set for Oct. 7: Fiscal Crisis and voter resentment led to recall*, S.F. Chron., July 25, 2003, at A1. As Governor Davis faced recall by the California voters, the State executed three new gaming compacts in August and September of 2003. *See* http://www.cgcc.ca.gov/compacts.asp (last visited

Apr. 6, 2010). These compacts were nearly identical to the 1999 Compacts, although they differed in one important respect: instead of requiring the compacting tribe to remit a percentage of its gaming device net win to the Special Distribution Fund, these compacts called for the revenue sharing with the State's *general fund*. *See, e.g.,* La Posta Band of Mission Indians Tribal-State Gaming Compact § 4.3.1(a), http://www.cgcc.ca.gov/compacts/8132009/laposta.pdf (last visited Apr. 6, 2010) ("The La Posta Tribe may operate no more than 350 Gaming Devices. From and after the first day of operation of its first Gaming Facility, the La Posta Tribe shall pay five percent (5%) of its Net Win from the operation of Gaming Devices to the California Gambling Control Commission, or such other State entity as may be designated by the Governor, for deposit into the General Fund."). All three compacts executed in 2003 calling for general fund revenue sharing were approved by the Department of the Interior. http://www.cgcc.ca.gov/compacts.asp (last visited Apr. 6, 2010).

In October 2003, Gray Davis was recalled, and Arnold Schwarzenegger was elected governor of California. The Schwarzenegger Administration has continued the late-term practice of the Davis Administration by negotiating general fund, rather than Special Distribution Fund, revenue sharing in new and amended tribal compacts. At present, fifteen Tribal-State compacts in California provide for general fund revenue sharing. *See* http://www.cgcc.ca.gov/Tribal/2009/GF%20Paying%20Tribes%20for%20Website%2003-04-09.pdf (last visited Apr. 6, 2010). Each of these compacts has been approved by the Secretary of the Interior.

## III

When Congress drafted IGRA, it did so against a well-defined legal background prohibiting states from directly taxing Indian tribes and tribal lands without express congressional authorization. With this history expressly in mind, *see* S.

REP. NO. 100-446, at 5, *reprinted in* 1988 U.S.C.C.A.N. 3071, 3075, Congress drafted two very specific provisions explaining (1) that IGRA's compact provisions, which allowed states to bargain with tribes over class III gaming regulation, did not authorize the states to impose a tax *on the tribe*, 25 U.S.C. § 2710(d)(4); and (2) that in the context of compact negotiations, a state's demand for otherwise-prohibited direct taxation of a tribe or its lands would be evidence of bad faith, *id.* § 2710(d)(7)(b)(iii)(II). These provisions were carefully worded to respond to a specific problem—the possibility that IGRA's class III gaming provisions might be interpreted by states as an "express congressional authorization" for direct taxation or, relatedly, that states might use compact negotiations to demand abrogation of a tribe's immunity to direct taxation.

The majority steps into these stalled negotiations with an astonishing proposition: a demand for revenue sharing by the State is "simply an impermissible demand for the payment of a tax by the tribe" prohibited by § 2710(d)(4), Maj. Op. at 5915, and under § 2710(d)(7)(B)(iii)(II) "is evidence of the State's bad faith," *id.* at 5893. The majority orders the parties either to reach a compact or submit to mediation, but in either case, there is only one outcome: The Band wins. California loses.

In my view, the majority has failed to recognize the legal and historical differences between taxation and revenue sharing. A tax is imposed by the state and may be collected by the state, under penalty of law, over the objections of its citizens. Revenue sharing, by contrast, is typically negotiated by the parties and then enforced through the law of contract. If the parties fail to agree to revenue sharing in the first instance, neither side can unilaterally compel the other to share revenues; there is no contract. Here, California has insisted that the Band share its gaming revenues as a condition to receiving authorization for additional gaming devices. To date, California has nothing to show for its negotiations and, under long-

established principles, no power to compel the Band to pay it a percentage of its revenues. California and the Band are independent sovereigns; they may negotiate an agreement or not, but neither has the power to tax the other. Thus, California's insistence on revenue sharing may be "a hard line stance," Maj. Op. at 5909, but it is not a tax.

A

The majority has confounded two distinct and well-defined concepts: "taxation" and "revenue sharing." As described by the majority:

> Under § 2710(d)(7)(B)(iii)(II), a court *must* consider a "demand" for a tax to be made in bad faith. A tax is "a *charge*, usu[ally] *monetary*, imposed by the government on persons, *entities, transactions*, or property *to yield public revenue*." Black's Law Dictionary 1594 (9th ed. 2009) (emphasis added). The State insisted that Rincon pay at least 10% of its net profits into the State's general fund. According to Cal. Govt. Code § 16300, "[t]he General Fund consists of money received into the treasury and not required by law to be credited to any other fund." No amount of semantic sophistry can undermine the obvious: a non-negotiable, mandatory payment of 10% of net profits into the State treasury for unrestricted use yields public revenue, and is a "tax."

Maj. Op. at 5892 (footnote omitted). Indeed, at every turn, the majority has equated revenue sharing with taxation. *See id.* at 5896 ("when the 'nature of the fees' is *general fund* revenue sharing—a bald demand for payment of a tax—the State faces a very difficult task to rebut the evidence of bad faith necessarily arising from that demand"); *id.* at 5915 ("The State's demand for 10-15% of Rincon's net win, to be paid into the State's general fund, is simply an impermissible demand for the payment of a tax by the tribe."). The majority fundamen-

tally errs when it declares that "general fund revenue sharing [is] a bald demand for payment of a tax." Maj. Op. at 5896. In a definition quoted by the majority itself, Black's Law Dictionary defines a "tax" as "[a] charge, usu[ally] monetary, *imposed by the government* on persons, entities, transactions, or property to yield public revenue." BLACK'S LAW DICTIONARY 1594 (9th ed. 2009) (emphasis added). Webster's Third New International Dictionary and The Oxford English Dictionary feature nearly identical definitions. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2345 (1993) (defining "tax" as "a usu[ally] pecuniary charge *imposed* by legislative or other public authority upon persons or property for public purposes: a *forced* contribution of wealth to meet the public needs of a government" (emphases added)); XVII THE OXFORD ENGLISH DICTIONARY 677 (2d ed. 1989) (defining "tax" as "[a] compulsory contribution to the support of government, *levied* on persons, property, income, commodities, transactions, etc., now at fixed rates, mostly proportional to the amount on which the contribution is *levied*" (emphases added)).[4] Whether the dictionary of record is Black's, Webster's 3d, or The Oxford English Dictionary, there are three components to the definition of "tax": (1) a monetary contribution; (2) *imposed by the government*; (3) to yield public revenue. The majority focuses on the first and third components—a monetary contribution yielding public revenue—but completely ignores the second component—the requirement that a charge be "*imposed*" or "*levied*" by the government before it can be deemed a "tax." *See* Maj. Op. at 5892-95. Yet, the fact that a monetary payment to the government is *imposed*, and not bargained-for, is *the* essential characteristic that defines a tax.

We have had occasion to consider what constitutes a tax,

---

[4]"Levied" is simply a tax term of art for "imposed." *See* BLACK'S LAW DICTIONARY 991 (9th ed. 2009) (defining "levy" as "[t]o impose or assess (a fine or tax) by legal authority"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1301 (1993) (defining "levy" as "to impose or collect (as a tax or tribute) by legal process or by authority").

and have "applied this tax definition: (1) *An involuntary* pecuniary burden (2) *imposed* by the state legislature (3) for a public purpose (4) under the state's police or taxing power. *Our point in so refining the definition of a tax was to distinguish taxes from debts for voluntarily assumed obligations . . . ."* *George v. Uninsured Employers Fund (In re George)*, 361 F.3d 1157, 1160 (9th Cir. 2006) (emphases added). As we explained in *In re Lorber Industries of California, Inc.*, "[i]n general, . . . charges can be classified as a tax only if they constitute 'a pecuniary burden laid upon individuals or property for the purpose of supporting the Government' or to support 'some special purpose authorized by it.' *Taxes are not equivalent to debts, which are voluntary obligations based on express or implied contracts. Taxes are levied without the consent or voluntary action of the taxpayer*." 675 F.2d 1062, 1066 (9th Cir. 1982) (emphasis added) (quoting *New Jersey v. Anderson*, 203 U.S. 483, 492 (1906)); *see also Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 340-41 (1974).[5]

---

[5]IGRA also recognized the distinction between a tax and a direct tax. *Compare* 25 U.S.C. § 2710(d)(4) (discussing the "impos[ition] of any tax, fee, charge, or other assessment upon an Indian tribe") *with* 25 U.S.C. § 2710(d)(7)(B)(iii)(II) (discussing "any demand by the State for direct taxation of the Indian tribe or of any Indian lands"). A direct tax is

> [a] tax that is imposed on property, as distinguished from a tax on a right or privilege. A direct tax is presumed to be borne by the person upon whom it is assessed, and not "passed on" to some other person.

BLACK'S LAW DICTIONARY 1595 (9th ed. 2009). *See also Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429, 588 (1895) (Field, J., concurring) ("Direct taxes, in a general and large sense, may be described as taxes derived immediately from the person, or from real or personal property, without any recourse therefrom to other sources for reimbursement."), *superseded by* U.S. CONST. amend. XVI; *Quarty v. United States*, 170 F.3d 961, 970 (9th Cir. 1999) ("In contrast to an excise or indirect tax, which is levied upon the use or transfer of property even though it might be measured by the property's value, a direct tax is levied upon the property itself." (quotation marks and citations omitted); LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 843 (3d ed. 2000) ("A direct tax is one imposed upon property as such, rather than on the performance of an act.").

The majority, however, simply sidesteps the "imposition" requirement by slapping the conclusory labels "non-negotiable" and "mandatory" on proposed revenue sharing payments that are neither. If the "payment of 10% of net profits into the State treasury for unrestricted use[,] yield[ing] public revenue" that the majority derides as a "non-negotiable, mandatory" tax, Maj. Op. at 5892, were either non-negotiable or mandatory, how is it that the State has not, to date, received one dime of general fund revenue from the Tribe? The answer, of course, is that the State's proposed 10% general fund revenue sharing payments are both negotiable (indeed, the 10% figure is just one of several revenue sharing proposals put forth by the State in negotiations with the Tribe) and subject to the Tribe's agreement in exchange for additional machines.

Perhaps the majority simply means that a fixed, agreed-to "payment . . . into the State treasure for unrestricted use yields public revenue, and is a tax," but this cannot be right, either. A purchaser of a bond—whether issued by a state, a municipality, or by the federal government—makes a monetary contribution that yields public revenue. But a bond is not a "tax." Indeed, a bond is not a "tax" even if its proceeds go to a State's general fund. The reason for this is simple: even though a bond purchaser pays money to the government to support its functions, this payment is not "imposed" on the purchaser; rather, the bond purchaser pays money to support the government *in exchange for something of value*, a future interest stream. Under the majority's definition, another "obvious" tax would be simply *gifting* ten percent of one's net revenue to the federal government. Such a gift would, after all, be a monetary contribution yielding public revenue. But although helpful to the public fisc, this voluntary contribution would not be a "tax."

B

We must contrast "taxation" with "revenue sharing," in which two parties—whether private firms or sovereign enti-

ties *agree* to split a certain proportion of revenues from a specified source.

Revenue sharing is ubiquitous. Private entities engage in revenue sharing in areas as diverse as movie rentals, *see* Brooks Barnes, *Movie Studios See a Threat in Growth of Redbox*, N.Y. TIMES, Sep. 6, 2009, at B1 (Redbox and Paramount), sports arenas, *see* Ken Belson and David M. Halbfinger, *Possible Truce Between New Jersey Arenas Could Come at a Cost to Fans*, N.Y. TIMES, Dec. 12, 2009, at B16 (Izod Center and Prudential Center in northern New Jersey), newspapers and web portals, *see* Evan Hessel, *Yahoo!'s Dangerous Newspaper Deal?*, FORBES ONLINE, June 22, 2009, http://www.forbes.com/2009/06/22/advertising-newspapers-internet-business-media-yahoo.html (last visited Apr. 6, 2010) (five newspapers and Yahoo!), and, of course, casinos, *see, e.g.,* Introduction to Slots and Video Gaming 76, International Game Technology, http://media.igt.com/Marketing/PromotionalLiterature/IntroductionToGaming.pdf (last visited Apr. 6, 2010) (slot machines and gaming venues).

Moreover, revenue sharing is hardly confined to the private realm. Since the 1880s, the federal government has contracted with private parties to operate "contract postal units" ("CPUs"), which are "postal facilities operated by private parties on private property pursuant to revenue-sharing contracts with the government." *Cooper v. United States Postal Serv.*, 577 F.3d 479, 485 (2d Cir. 2009). In exchange for the right to operate a postal facility, a CPU submits all of its revenues to the Postal Service, which then repays a portion of the revenue to the CPU. Like the federal government, state and local governments also enter into revenue-sharing contracts with private firms. For example, under a federal program administered by the U.S. Department of Transportation, a number of state and local governments contract with a private firm to collect and analyze traffic data. *See* Eric Lipton*, U.S. System for Tracking Traffic Flow is Faulted*, N.Y. TIMES, Dec. 13, 2009, at A22; *see also* Federal Highway Administration

Report No. MH-2010-030, *Transportation Technology Innovation and Demonstration Program* (Dec. 8, 2009), http://www.oig.dot.gov/sites/dot/files/TTID_12_8_2009 .pdf (last visited Apr. 6, 2010) ("TTID Report"). The private firm is supposed to remit to these state and local governments a percentage of the money it makes from selling its traffic data, which Congress has described as revenue sharing, not a tax. *See* Pub. L. 105-178, § 5117(b)(3)(B)(iii) (June 9, 1998); *see generally* TTID Report at 6-8.

Federal, state and local governments have long entered into revenue sharing agreements with each other. "A form of general revenue sharing was actually in operation as early as 1836[,] when nearly $28 million was deposited with State governments. In [the twentieth] century, congressional attempts to secure Federal tax sharing date back to 1949[,] when a Member of Congress from Kansas introduced a bill to transfer to State treasuries 1 percent of Federal individual and corporate income taxes raised within the State." *Council of and for the Blind of Del. County Valley, Inc. v. Regan*, 709 F.2d 1521, 1523 n.2 (D.C. Cir. 1983) (en banc) (quotation marks, ellipses, brackets, and citation omitted); *see also* 43 U.S.C. § 1608 *et seq.* (requiring the United States and the State of Alaska to pay to Native Alaskans two percent of annual gross revenue from the disposition of minerals removed from that state; Congress titled this program "revenue sharing").

Perhaps the most prominent example of broad-based intergovernmental revenue sharing was the State and Local Fiscal Assistance Act of 1972, Pub. L. 92-512, 86 Stat. 919, more commonly known as the Revenue Sharing Act. *See generally* President Richard Nixon, Statement About the General Revenue Sharing Bill (Oct. 20, 1972) (transcript available at http://www.presidency.ucsb.edu/ws/index.php?pid=3636 (last visited Apr. 6, 2010)). Under the Revenue Sharing Act, Congress "g[ave] legal effect to a concept which had been proposed intermittently for more than 20 years—that the federal

government make general revenue grants to state and local governments with no strings attached." *Council of and for the Blind of Del. County Valley, Inc.*, 709 F.2d at 1523. For just over a decade (the program was allowed to expire in 1983), the federal government paid billions of dollars to state and local government *general funds* with "no strings . . . attached." *See* S. REP. NO. 92-1050, at 3876 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3874, 3876; *Goolsby v. Blumenthal*, 590 F.2d 1369, 1371 (5th Cir. 1979) (en banc).[6]

As these examples demonstrate, there is a long history of revenue sharing in the United States. It has taken two forms. First, there is vertical revenue sharing, where one government decides to share its revenues with another (smaller) governmental entity. In this form of revenue sharing, the smaller entity has no continuing demand on the revenues; it appears that the decision by the larger entity to engage in revenue sharing is one of largesse and can be amended at any time. The second form is horizontal or negotiated revenue sharing, where two sovereigns, two private entities, or a sovereign and a private entity negotiate revenue sharing as a matter of contract. Horizontal revenue sharing is a voluntary matter, to be agreed upon by the parties as a part of their overall negotiations. No one has ever thought that horizontal revenue sharing is a form of taxation.

C

The ultimate question, then, is whether California's demand for a share of the Band's gaming revenues is direct taxation or a form of revenue sharing. The answer is critical to the resolution of this case. In my view, the answer is not a difficult one.

---

[6]States have their own forms of intergovernmental revenue sharing. For example, California has decided to share its cigarette tax revenues with its counties and cities, but not with the Indian tribes within its borders. CAL. REV. & TAX § 30462; *see Chemehuevi Indian Tribe v. Cal. State Bd. of Equalization*, 800 F.2d 1446, 1450 (9th Cir. 1986).

IGRA requires that tribes and states "enter[ ] into a Tribal-State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(3)(A). Congress's chosen words here— " 'enter," "compact," and "governing"—are the language of treaties and other sovereign-to-sovereign agreements. Since the states are barred from entering into "any Treaty, Alliance, or Confederation," U.S. CONST. art. I, § 10, cl. 1, Congress chose an appropriate word: "compact"—the very definition of which implies negotiation between equal parties. *See* BLACK'S LAW DICTIONARY 318 (9th ed. 2009) (defining "compact" as "[a]n agreement or covenant between two or more parties, esp. between governments or states"). Notably, the tribal-state compacts in IGRA, which derive their existence from a congressional enactment and must be approved by the Secretary of the Interior, resemble very closely the interstate compacts described by the Constitution's Compact Clause. *See* U.S. CONST. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State . . . ."). An interstate compact, even if it involves the exchange of funds, is not interstate *taxation*, but "[a] voluntary agreement between states enacted into law in the participating states upon federal congressional approval." BLACK'S LAW DICTIONARY 318 (9th ed. 2009). Critically, "[i]nterstate compacts, like treaties, are presumed to be the subject of careful consideration before they are entered into, and are drawn by persons competent to express their meaning, and to choose apt words in which to embody the purposes of the high contracting parties." *New Jersey v. Delaware*, 552 U.S. 597, 615-16 (2008) (quotation marks omitted).

As a sovereign (a state) negotiating a compact with another sovereign (an Indian tribe), California has no "authority to impose any tax" on the Band. 25 U.S.C. § 2710(d)(4). It may "demand" that the Band share a portion of its gaming revenues with the State, but "demands" are part and parcel of negotiations; as in negotiations between private parties, the State has no authority to impose such a requirement unilaterally. This case is the best proof of this principle. California

can demand general revenue sharing until it is hoarse, but it will not get revenue from the Band until the Band agrees. The State's strategy is aggressive, and aggression in negotiations comes with the risk that the deal will fall through. California is running that risk. For all of its posturing and demands, California has, to date, not one penny to show for its negotiations with the Band.[7]

In the tribal-state compacts California has negotiated since 2003, it has secured revenue sharing from other tribes. It has not *imposed* revenue sharing, but rather obtained it through sovereign-to-sovereign negotiations. When "two equal sovereigns," S. Rep. No. 100-446, at 13, *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083; *Coyote Valley II*, 331 F.3d at 1112, negotiate a percentage of gross revenue to be paid from one party to the other in exchange for other concessions, this is *revenue sharing*—even if the revenue is not earmarked for a specific fund. Revenue sharing is not a "tax," and it is certainly not "direct taxation of [a] tribe or . . . [its] lands." 25 U.S.C. § 2710(d)(7)(B)(iii)(II). The majority errs when it holds otherwise.

## IV

Although much of the majority opinion is devoted to hold-

---

[7]I do not doubt for a moment that a tribe would regard a demand for revenue sharing with the same disdain it would the imposition of a tax. That is, a tribe may equate revenue sharing and taxation because they have the same *economic* effect on its welfare. But the *legal* difference between the two is significant, for reasons I have described above.

A simple example illustrates my point about the difference between an economic and a legal effect. Whether my landlord raises my rent by $100 a month or the government increases my income taxes by $100 a month, the economic impact on me is the same: I am out an additional $100 a month. But there are legal and political consequences where government imposes additional taxes that are not found in the rent increase. No one would mistake the rent increase for a tax, even though my checkbook can't tell the difference between the two.

ing that California's revenue sharing proposal is a tax, the majority stops short of conceding that all revenue sharing provisions are prohibited. *See* Maj. Op. at 5906 ("[W]e do not hold that no future revenue sharing is permissible . . . ."). The majority qualifies its concern so long as two conditions are satisfied: First, that the State has offered "meaningful concessions," *Coyote Valley II*, 331 F.3d at 1111, and second, that the purposes for which the State intends to use the revenue are directly related to the operation of gaming activities, *see* 25 U.S.C. § 2710(d)(3)(C) ("Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to . . . (vii) any other subjects that are directly related to the operation of gaming activities."). In my view, the majority has misread both requirements.

A

In *Coyote Valley II*, we held that where California "offered meaningful concessions in return for its demands, it did not 'impose' [a putative tax] within the meaning of § 2710(d)(4)." 331 F.3d at 1111. We expressed concern that, if a state demanded revenue from a tribe without offering anything in return, then the revenue demand might constitute an "impose[d] tax, fee, charge, or other assessment," which IGRA's compact provisions did not authorize. 25 U.S.C. § 2710(d)(4). However, we did not actually decide whether such a demand would constitute the imposition of a tax, fee, or charge, because we found that California had offered concessions in the negotiating process:

> We do not hold that the State could have, *without offering anything in return*, taken the position that it would conclude a Tribal-State compact with Coyote Valley only if the tribe agreed to pay into the RSTF. Where, as here, however, a State offers meaningful concessions in return for fee demands, it does not exercise "authority to impose" anything. Instead, it

exercises its authority to negotiate, which IGRA clearly permits.

*Coyote Valley II*, 331 F.3d at 1112. Similarly, in *Shoshone-Bannock Tribes*, we observed that § 2710(d)(4) was not a bar where "the parties *negotiated* a bargain permitting such payments in return for meaningful concessions from the state (such as a conferred monopoly or other benefits)." 465 F.3d at 1101. We reasoned that "[a]lthough the state did not have *authority* to exact such payments, it could bargain to receive them in exhange for a quid pro quo conferred in the compact." *Id.*

The majority goes one step beyond *Coyote Valley II* and *Shoshone-Bannock Tribes*. Unfortunately, it goes in the wrong direction. Instead of allowing the parties to work out their differences through the negotiating process, it finds that the State did not offer "meaningful concessions" to the Band because it "disagree[s] that the State makes 'meaningful concessions' whenever it offers a bundle of rights more valuable than the status quo." Maj. Op. at 5912. The majority's statement mangles the phrase "meaningful concessions": it is hard to think what concession could be *more* meaningful than "a bundle of rights more valuable than the status quo."

The majority's novel conception of "meaningful concessions" finds no support in IGRA and conflicts with our explanation of "meaningful concessions" in *Coyote Valley II*, the Department of the Interior's reading of the Act, and centuries of contracts jurisprudence as well.

A "meaningful concession" is something conceded or granted that is real to at least one of the parties and not merely nominal or illusory. Notably, this is *exactly* how we described the requisite "concessions" under 25 U.S.C. § 2710(d)(4) in *Coyote Valley II*: "If [ ] offered concessions by a State are *real*, § 2710(d)(4) does not categorically prohibit fee

demands." 331 F.3d at 1112 (emphasis added). Simply put, "meaningful" implies "non-negligible," but no more.

The Department of Interior has also interpreted "meaningful concessions" along the same line. As described in an IGRA review letter by the Principal Deputy Assistant Secretary of the Interior:

> As our previous compact decision letters have stated, in order to determine whether revenue sharing violates 25 U.S.C. § 2710(d)(4), we first look to whether the State has offered meaningful concessions. We have traditionally viewed this concept as one where the State concedes *something* that it was otherwise not required to negotiate that provides a benefit to the Tribe, i.e. exclusivity or some other benefit.

Absentee Shawnee Tribe Oklahoma, Dept. of Interior IGRA Rev. Ltr. (Dec. 17, 2004), http://www.nigc.gov/Portals/0/NIGC%20Uploads/readingroom/compacts/Absentee%20Shawnee%20Tribe%20of%20Oklahoma/absenteeshawnee121704.pdf (last visited Apr. 6, 2010) (emphasis added). DOI's interpretation of "meaningful concession[ ]" as "the State conced[ing] *something* that it was otherwise not required to negotiate" accords with the phrase's plain meaning and also falls neatly within black-letter contract law.

This understanding of "meaningful concession[ ]" dovetails nicely with one of the most venerable concepts in the common law—the doctrine of consideration. Under the common law of contracts, a court will not weigh the adequacy, in the sense of *market equivalence*, of bargained-for consideration, but will determine whether putative consideration is nominal or a "sham." *See* 4 JOSEPH M. PERILLO ET AL., CORBIN ON CONTRACTS §§ 5.14, 5.17 (2d ed. 1995). Thus, a court will make a threshold inquiry to make sure that what is exchanged is not a "pretense," but will not assign its own subjective valu-

ation to each side's respective concessions. In the words of a leading treatise, this approach to contract law is the very cornerstone of market exchange:

> We have a free market, under our common law, for the reason that the courts have left it free. They do not require that one person shall pay as much as others may be willing to pay, or that one person shall receive as little as others may be willing to receive for a like article. The contracting parties make their own contracts, agree upon their own exchanges, and fix their own values.

4 CORBIN ON CONTRACTS § 5.14.

In light of our own explanation of the phrase in *Coyote Valley II*, DOI's understanding of the phrase, and black letter contract law, there can be little doubt that when we used the phrase "meaningful concessions" in *Coyote Valley II*, we were describing exactly what the majority rejects: a State makes "meaningful concessions" whenever it offers a bundle of rights more valuable than the status quo. Courts have not traditionally tipped the scales of negotiations between two well-represented parties, and there is no warrant in IGRA or in *Coyote Valley II* to do so here. *Coyote Valley II* states the applicable test as plainly as words will allow: "If . . . offered concessions by a State are *real*, § 2710(d)(4) does not categorically prohibit fee demands." 331 F.3d at 1112 (emphasis added).

B

Equally infirm is the majority's restricted reading of § 2710(d)(3)(C)(vii) and its conception of what a state may do with the revenue it has bargained for. In the end analysis, I think that the majority has turned *Coyote Valley II* on its head. The majority now holds that "[w]hether revenue sharing is an authorized negotiation topic . . . depends on the *use* to which

the revenue will be put, not on the mere fact that the revenue derives from gaming activities." Maj. Op. at 5899. As described by the majority, the RSTF and SDF addressed "fair distribution of gaming opportunities and compensation for the negative externalities caused by gaming" and did not " 'put tribal money into the pocket of the State.' " *Id.* at 5899-90 (quoting *Coyote Valley II*, 331 F.3d at 1113). But whereas in *Coyote Valley II* we simply held that the RSTF and SDF were permissible subjects of negotiation, the majority now holds that the RSTF and SDF represented the *outer limits* of permissible negotiation. Thus, the majority answers the question we reserved in *Coyote Valley II* and holds that "general fund revenue sharing is not 'directly related to the operation of gaming activities' and is thus not an authorized subject of negotiation." Maj. Op. at 5900 (quoting 25 U.S.C. § 2710(d)(3)(C)(vii)); *see also id.* at 5910 ("[G]eneral fund revenue sharing is not a state public policy interest directly related to gaming and is not an authorized negotiation topic . . . .").

I have two responses to the majority's analysis. First, I do not think that § 2710(d)(3)(C) is so limited. The listing of subjects that are appropriate for State-Tribe negotiations is permissive: the compact "*may* include provisions relating to" the items on the list. 25 U.S.C. § 2710(d)(3)(C) (emphasis added). In *United States v. Redman*, 35 F.3d 437 (9th Cir. 1994), we interpreted the phrases "may consider," "shall consider," and "should consider" in successive versions of the Sentencing Guidelines. *Id.* at 440-41. The 1989 amendment to § 5G1.3(c) of the Guidelines provided that the court "may consider" a reasonable incremental penalty to be a sentence for the instant offense, while the 1991 amendment to this section used the phrase "shall consider," and the 1992 amendment to the same section used the phrase "should consider." *Id.* We noted that "Webster defines the word 'may' as 'have permission to[,]' WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1396 (1986) . . .[,] '[s]hall' is defined as being 'used in laws, regulations and directives to express what is mandatory[,]' *id.* at

2085[, and] '[s]hould' is used to express what is 'probable or expected[,]' *id.* at 2104," and reasoned:

> The meaning of the current "should consider" language in § 5G1.3 can be discerned by reference to the earlier iterations of the Guideline. Under the 1989 ["may consider"] amendment, *courts had complete discretion to employ the commentary methodology or not* when deciding on a reasonable incremental penalty. The 1991 ["shall consider"] amendment stripped courts of all discretion in the matter. . . . The "should consider" language in the current version falls somewhere between the "may consider" language in the 1989 amendment and the "shall impose" mandate of the 1991 version.

*Redman*, 35 F.3d 440-441 (citations omitted). In short, we have interpreted the word "may" as Webster's Third New International Dictionary defines it: as a *grant of permission* rather than an prescriptive limitation. Section 2710(d)(3)(C), which enumerates a number of subjects which a Tribal-State compact "*may* include provisions relating to," identifies these interests as permitted subjects of negotiation, but neither explicitly nor implicitly restricts negotiations to these interests.[8]

---

[8]The majority opines that "[t]he language and structure of § 2710(d)(3)(C) suggest it is exhaustive." Maj. Op. at 5890 n.9. But the majority's analysis on this point runs contrary to our longstanding interpretation of the compact requirement's closest legal analog: the "good faith bargaining" requirement in the National Labor Relations Act. *See In re Indian Gaming Related Cases* ("*Coyote Valley I*"), 147 F. Supp. 2d 1011, 1020-21 (N.D. Cal. 2001) ("Like IGRA, the NLRA imposes a duty to bargain in good faith, but does not expressly define 'good faith.' . . . The Court does not intend to import federal case law interpreting the NLRA wholesale into its interpretation of the IGRA . . . . However, the Court considers the NLRA case law for guidance in interpreting a standard undefined by the IGRA."), *aff'd*, *Coyote Valley II*, 331 F.3d 1094.

Under section 158 of the NLRA, 29 U.S.C. § 158 *et seq.*, there is an "[o]bligation to bargain collectively," defined as "the performance of the

*See* generally COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 873 (2005 ed.) ("Tribes and states may include a wide variety of subjects in the gaming compacts. . . . More than 200 tribal-state compacts have been approved, and they are often subject to amendments, as well as new negotiations if they have sunset provisions. It is thus impossible to generalize about the content of provisions . . .").

Even if the list outlined in § 2710(d)(3)(C)(i)-(vii) were exclusive—a proposition that runs contrary to the dictionary definition of "may," our interpretation of the term "may" as used in other congressional enactments, and our longstanding interpretation of § 158(d) of the NLRA—the State's revenue-sharing proposal would still be an authorized subject of negotiation, as it falls within § 2710(d)(3)(C)(vii), a catch-all provision authorizing negotiation of "any other subjects that are directly related to the operation of gaming activities." The majority reads this clause very restrictively, explaining that

_____

mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." *Id.* § 158(d). The list "wages, hours, and other terms and conditions of employment" could easily be read to comprise the entirety of *permissible* subjects that could be collectively bargained; i.e., the list could be read as "exhaustive," an interpretation the majority believes is compelled by the language and structure of § 2710(d)(3)(C) in IGRA. Like the subjects in 25 U.S.C. § 2710(d)(3)(C), the subjects in 29 U.S.C. § 158(d) include a broad final clause—in IGRA, "any other subjects that are directly related to the operation of gaming activities," and in the NLRA, "other terms and conditions of employment." Yet 29 U.S.C. § 158(d) has *not* been interpreted to establish an "exhaustive" list of subjects that may be negotiated in collective bargaining. Instead, we have interpreted § 158(d) as setting out "[m]andatory subjects—'wages, hours, and other terms and conditions of employment'—[that] must be bargained collectively in good faith," *Retlaw Broad. Co. v. NLRB*, 172 F.3d 660, 665 (9th Cir. 1999), but which are not the *only* subjects subject to collective bargaining. Rather, "all other subjects are permissive subjects," which "deal with a wide range of matters deemed to fall outside the framework of mandatory terms." *Id.*(quotation marks omitted).

"[w]hether revenue sharing is an authorized negotiation topic under § 2710(d)(3)(C)(vii) [ ] depends on the *use* to which the revenue will be put, not on the mere fact that the revenue derives from gaming activities," Maj. Op. at 5899; *see also id.* at 5890 n.9, but its reading of § 2710(d)(3)(c)(vii) cannot be reconciled with our decision in *Coyote Valley II*.

In *Coyote Valley II*, we rejected the tribe's request "to read § 2710(d)(3)(C)(vii) narrowly and to hold that it does not encompass a provision like the RSTF." 331 F.3d at 111. Instead, "we h[e]ld that § 2710(d)(3)(C)(vii) authorize[d] the RSTF provision . . . ." 331 F.3d at 1111. Critically, the RSTF did not *use* revenue for gaming purposes. Rather, the RSTF distributed revenue to *non-gaming* tribes, who could use it however they saw fit; the RSTF was effectively a contribution to the non-gaming tribes' general revenue funds. The RSTF certainly used revenue for the benefit of Indian tribes, but it did *not* use revenue for any *purpose* directly related to gaming. Our express holding in *Coyote Valley II* that "the RSTF provision clearly falls within [§ 2710(d)(3)(C)(vii)'s] scope," *id.*, is irreconcilable with the "use" restriction relied on by the majority.

The majority also runs afoul of *Coyote Valley II* when it declares that "what compels a limited reading [of § 2710(d)(3)(C)(vii)] is the canon of construction obligating us to construe a statute abrogating tribal rights narrowly and most favorably towards tribal interests." Maj. Op. at 5890 n.9. This canon, which "we regard [ ] as a mere guideline and not a substantive law," *Williams v. Babbitt*, 115 F.3d 657, 663 n.5 (9th Cir. 1997) (quotation marks omitted), only applies to "ambiguous provisions," *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). Yet in *Coyote Valley II*, we held that § 2710(d)(3)(C)(vii) "is not ambiguous and that the RSTF provision clearly falls within its scope," rejecting the tribe's argument that the RSTF provision was unauthorized under § 2710(d)(3)(C)(vii) based on the principle that "we should interpret any ambiguities on these issues in a matter

that will be most favorable to tribal interests." 331 F.3d at 1111 (quotation marks omitted). Since we have expressly held that § 2710(d)(3)(C)(vii) is not ambiguous, the canon that ambiguities in statutes should be construed in favor of Indian tribes is inapplicable. Once again, the majority is simply wrong on this point.[9]

Instead of rigidly imposing a gaming-only restriction on how negotiated revenue sharing may be used, § 2710(d)(3)(C)(vii) simply "prevent[s] compacts from being

---

[9]To the extent the majority relies on this canon beyond its interpretation of § 2710(d)(3)(C)(vii) (to which we have already held the canon inapplicable), even this reliance is flawed. As we explained in *Coyote Valley II* and as the Supreme Court made clear in *Seminole Tribe*, IGRA involved *two* countervailing sovereign interests—states and Indian tribes—and it granted authority to *each*. *See Coyote Valley II*, 331 F.3d at 1096 ("IGRA . . . seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme."); *Seminole Tribe*, 517 U.S. at 58 ("[T]he Act grants the States a power that they would not otherwise have . . . ."). Although states have not traditionally had the power to regulate Indian tribes, states *have* traditionally had the power to regulate the scope of gambling within their territorial borders. As the Supreme Court has explained, "Congress should make its intention clear and manifest if it intends to pre-empt the historic powers of the States. . . . This plain statement rule is . . . an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (quotation marks and internal citation omitted); *see also, e.g., Owasso Indep. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 435-36 (2002) (rejecting a proposed interpretation of the ambiguous term "education records" in the Family Education Rights and Privacy Act where it was "doubt[ful] Congress meant to intervene in this drastic fashion with traditional state functions. . . . The Congress is not likely to have mandated this result, and we do not interpret the statute to require it."). Thus, to the extent that IGRA's provisions other than § 2710(d)(3)(C)(vii) are ambiguous, this is a "dueling canons" situation in which it is far from clear that the federalism canon should be shoved aside in favor of the tribal sovereignty canon. *See, e.g., Fla. Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S. Ct. 2326, 2338 (2008) ("We agree with Florida that the federalism canon . . . obliges us to construe [a statutory exemption from state taxation] narrowly.").

used as a subterfuge for imposing State jurisdiction on tribes concerning issues unrelated to gaming." *Coyote Valley II*, 331 F.3d at 1111. As in *Coyote Valley II*, "the State has not sought to engage in such a subterfuge" here. *Id.* Tribes such as the Band are asking for something from the State—additional gaming devices—to which they are not entitled under their current compacts. California has requested a share of the revenues *generated by those devices*. This seems pretty "related to the operation of gaming activities" to me. If, for example, California had asked the Band to open a water park on tribal lands located elsewhere in the state or to make a donation to the booster club at UCLA, we might have an issue.

The majority and I would probably agree that it would have been better if Congress had made it explicit in IGRA whether general revenue sharing could be a part of compact negotiations or not. But it didn't, and that failure has generated public controversy, litigation, and a cottage industry in law review articles.[10] Unfortunately, the only consensus among academics

---

[10]*See, e.g.*, Katie Eidson, Note, *Will States Continue to Provide Exclusivity in Tribal Gaming Compacts or Will Tribes Bust on the Hand of the State in Order to Expand Indian Gaming?*, 29 AM. INDIAN L. REV. 319, 325-39 (2004); Courtney J.A. DaCosta, Note, *When "Turnabout" Is Not "Fair Play": Tribal Immunity under the Indian Gaming Regulatory Act*, 97 GEO. L.J. 515, 542-546 (2009); Ezekiel J.N. Fletcher, *Negotiating Meaningful Concessions from States in Gaming Compacts to Further Tribal Economic Development: Satisfying the "Economic Benefits" Test*, 54 S.D. L. REV. 419, 431-39 (2009); Matthew L.M. Fletcher, *Bringing Balance to Indian Gaming*, 44 HARV. J. ON LEGIS. 39, 57-95 (2007); Eric S. Lent, Note, *Are States Beating the House?: The Validity of Tribal-State Revenue Sharing under the Indian Gaming Regulatory Act*, 91 GEO. L.J. 451, 453-74 (2003); Matthew Murphy, Note, *Betting the Rancheria: Environmental Protections as Bargaining Chips under the Indian Gaming Regulatory Act*, 36 B.C. ENVTL. AFF. L. REV. 171, 181-84 (2009); Kathryn R.L. Rand, *Caught in the Middle: How State Politics, State Law, and State Courts Constrain Tribal Influence over Indian Gaming*, 90 MARQ. L. REV. 971, 985-87 (2007); Kathryn R.L. Rand and Steven Andrew Light, *How Congress Can and Should "Fix" the Indian Gaming Regulatory Act: Recommendations for Law and Policy Reform*, 13 VA. J. SOC. POL'Y & L. 396, 462-65 (2006); Joshua L. Sohn, *The Double-Edged Sword of Indian Gaming*, 42 TULSA L. REV. 139, 150-56 (2006).

appears to be that Congress should clarify the issue and address revenue sharing head-on.[11] States and tribes, however, do appear to have reached a consensus, at least in practice:

> Although it is clear that states may not tax gaming activities, tribes and states have devised approaches that allow some form of revenue sharing with the states . . . . The Secretary of the Interior has approved revenue sharing arrangements on the ground that those payments are not taxes, but exchanges of cash for significant economic value conferred by the exclusive or substantially exclusive right to conduct gaming in the state . . . . Despite generating high-level publicity and debate, revenue sharing provides states and tribes with the means to consummate compacts that both sides can legitimately claim will provide substantial economic benefits to their constituents.

Cohen's Handbook of Federal Indian Law 874. Perhaps the best evidence for the practice is the fact that, after twenty years of experience with IGRA, every compact negotiated in

---

[11]Much of the academic literature disapproves of tribal-state revenue sharing as a normative matter, but the legal consensus—particularly among professorial, as opposed to student, authors—appears to be that IGRA is simply silent on the issue of revenue sharing. Commentators have suggested that Congress clarify the issue. *See* Fletcher, 44 Harv. J. on Legis. at 94 ("argu[ing] that a legislative package to ratify and authorize revenue sharing . . . [would] alleviate the major problems in IGRA . . ."); Rand and Light, 13 Va. J. Soc. Pol'y & L. at 462 (recommending that Congress "[a]mend IGRA to create a revenue-sharing structure that encourages cooperative tribal-state policymaking while ensuring tribes remain the primary beneficiaries of Indian gaming by creating a presumptive rebuttable cap"); *see also Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 932 (7th Cir. 2008) ("The validity, under the IGRA, of revenue-sharing agreements in tribal-state compacts has been a contentious issue. . . . [T]he legitimacy of these revenue-sharing provisions is far from a settled issue.").

recent years-including compacts in Connecticut,[12] Florida,[13] Michigan,[14] New York,[15] New Mexico,[16] Oklahoma,[17] Wiscon-

---

[12]*See* Mashantucket Pequot Tribe Memorandum of Understanding (Apr. 30, 1993) (providing for revenue sharing of twenty-five percent of gross operating revenues from electronic gaming machines), http://www.ct.gov/dosr/lib/dosr/Memorandum_Of_Understanding_Foxwoods.pdf (last visited Apr. 6, 2010); Mohegan Tribe Memorandum of Understanding (May 17, 1994), http://www.ct.gov/dosr/lib/dosr/Memorandum_Of_Understanding_Mohegan.pdf (last visited Apr. 6, 2010) (same); *see also* http://www.ct.gov/dosr/lib/dosr/tribal_state_compact_foxwoods.pdf (last visited Apr. 6, 2010) (stating that assessment pursuant to 25 U.S.C. § 2710(d)(3)(C)(iii) is to be paid into State's general fund); http://www.ct.gov/dosr/lib/dosr/tribal_state_compact_mohegan.pdf (last visited Apr. 6, 2010) (same).

[13]*See* Seminole Tribe of Florida Compact Pt. XI and Exh. A (Nov. 14, 2007), http://www.flgov.com/pdfs/2007114compact_exhibita.pdf (last visited Apr. 6, 2010) (providing for revenue sharing of between ten and twenty-five percent of the tribe's net win, and noting that "[t]he appropriation of any Payments received by the State pursuant to this Compact lies within the exclusive prerogative of the Legislature").

[14] *See, e.g.*, Match-E-Be-Nash-She-Wish Band of Pattawatomi Indians of Michigan Compact § 15-17 (May 9, 2007), http://www.michigan.gov/documents/mgcb/Gunlake_Compact_276443_7.pdf (last visited Apr. 6, 2010) (providing for eight to twelve percent of net win to be paid into Michigan Strategic Fund, a state economic development fund in no way related to gaming or its effects, providing for additional two percent revenue sharing between the tribe and affected local governments, and explaining that "[b]y entering into this agreement neither the Tribe nor the State of Michigan intend to create any new authority, nor to expand or diminish any existing authority, on the part of the State of Michigan to impose taxes upon the Tribe, its members, or any person or entity doing business with the Tribe pursuant to this Compact").

[15]*See* Seneca Nation of Indians Compact § 12(b) (April 12, 2002), http://www.ncai.org/ncai/resource/agreements/ny_gaming-seneca_nation-4-12-2002.pdf (last visited Apr. 6, 2010) (providing for general fund revenue sharing of eighteen to twenty-five percent, depending on year).

[16]*See* Tribal-State Class III Gaming Compact § 11 (2007), http://www.nmgcb.org/tribal/2007%20compact.pdf (last visited Apr. 6, 2010) (providing for payment by tribe of a percentage of gaming machine net win "to the State Treasurer for deposit into the General Fund of the State").

[17]*See* Oklahoma Tribal-State Gaming Act Model Tribal Gaming Com-

sin,[18] and, of course, California—has included general revenue sharing. Equally significant, the Secretary of the Interior has sanctioned these compacts.[19] Many of the payments under

pact, 3A Okla. Stat. § 281 Part 11 (outlining percentage of adjusted gross gaming revenues that are to be paid to the State by tribes, and providing: "Payments of such fees shall be made to the Treasurer of the State of Oklahoma. Nothing herein shall require the allocation of such fees to particular state purposes, including, but not limited to, the actual costs of performing the state's regulatory responsibilities hereunder.").

[18]*See, e.g.,* Amendments to the Menominee Indian Tribe of Wisconsin Compact § 42 (Apr. 2003), http://www.doa.state.wi.us/docview.asp?docid=2147 (last visited Apr. 6, 2010) (amending tribal-state compact to provide for general fund, rather than earmarked, revenue sharing).

[19]The majority has erred to the extent it implies that the Eleventh Amendment prevents the Secretary from disapproving compacts he considers illegal under IGRA. *See* Maj. Op. at 5885-86 n.8. Under IGRA, the Secretary may disapprove any compact he determines "violates—(i) *any provision of this Act*, (ii) any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or (iii) the trust obligations of the United States to Indians." 25 U.S.C. § 2710(d)(8)(B)(i)-(iii) (emphasis added). The Secretary, who is "charg[ed by Congress] . . . with broad responsibility for the welfare of Indian tribes," *Udall*, 366 F.2d at 672, and owes "the Indians . . . [a] duty of care and protection," *Rainbow*, 161 F. at 838, is charged by IGRA with conducting an independent review of the legality of compacts, irrespective of whether the tribes can challenge those compacts in federal court. *Cf. Knight v. United States Land Ass'n*, 142 U.S. 161 (1891) ("The Secretary [of the Interior] is the guardian of the people of the United States over the public lands. The obligations of his oath of office oblige him to see that the law is carried out . . . .").

Moreover, as the majority itself explains, where the Secretary has had concerns about a compact but nonetheless felt the compact should not be disapproved, he has voiced these concerns explicitly. *See Pueblo of Sandia v. Babbitt*, 47 F. Supp. 2d 49, 51 (D.D.C. 1999). Yet the Secretary has approved, or deemed approved *without any cautionary language*, dozens of compacts or compact amendments providing for general revenue sharing, including all fifteen compacts calling for general revenue sharing by California tribes. *See, e.g.,* 69 Fed. Reg. 76,004 (Dec. 20, 2004) (approving compact between California and Coyote Valley Band of Pomo Indians); 72 Fed Reg. 36,717 (July 5, 2007) (approving compacts between

these compacts are substantial. For example, Florida receives approximately $100 million annually in general fund revenue sharing from the Seminole Tribe, Courtney J.A. DaCosta, Note, *When "Turnabout" Is Not "Fair Play": Tribal Immunity under the Indian Gaming Regulatory Act*, 97 GEO. L.J. 515, 543 (2009), while New Mexico's general fund received nearly $63 million in revenue sharing payments between October 1, 2008 and September 30, 2009, *see* http://www.nmgcb.org/tribal/revsharing.html. In Connecticut, home to the nation's largest tribal casino and two of the largest casinos in the entire world, the Mashantucket Pequot and Mohegan tribes pay twenty-five percent of gross revenue from electronic gaming machines to the State of Connecticut's general fund. *See supra* n.9. In 2008, the last full calendar year for which revenue information is available, Connecticut received $411,410,973 in general fund revenue under the Mashantucket Pequot and Mohegan gaming compacts,http://www.ct.gov/dosr/lib/dosr/General_Fund_Revenues_All_Games.pdf (last visited Apr. 6, 2010), about half of which came from Connecticut's slot machine revenue sharing agreement with the tribes, http://www.ct.gov/dosr/lib/dosr/Fosltweb.pdf (last visited Apr. 6, 2010). In the years 2003-07, Connecticut received $387 million, $403 million, $418 million, $428 million, and $430 million, respectively in

State of New Mexico and the Pueblo of Isleta, Pueblo of Nambe, Pueblo of Picuris, Pueblo of San Felipe, Pueblo of Sandia, Pueblo of Santa Ana, Pueblo of Tesuque, Pueblo of Taos, Pueblo of Santa Clara and Ohkay Owingeh); 72 Fed. Reg. 58,333 (Oct. 15, 2007) (approving compact between New Mexico and Pueblo of Laguna); 72 Fed. Reg. 71,939-40 (Dec. 19, 2007) (deeming approved, without cautionary language, compacts between California and Morongo Band of Mission Indians, Pechanga Band of Luiseno Indians, and Agua Caliente Band of Cahuilla Indians); 73 Fed. Reg. 1229 (Jan. 7, 2008) (deeming approved compact between Florida and Seminole Tribe of Florida); 73 Fed. Reg. 3480 (Jan. 18, 2008) (approving compact between California and San Manuel Band of Mission Indians); 74 Fed. Reg. 18397 (Apr. 22, 2009) (deeming approved, without cautionary language, compact between Michigan and Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan).

general fund revenue from its tribal casinos. The Secretary of the Interior, charged with seeing to the general welfare of the tribes, has approved the revenue sharing provisions of every one these compacts, taking the "view[ that] revenue-sharing arrangements are lawful so long as the state offers the tribe separate consideration in exchange for a cut of the tribe's gaming revenues." Dacosta, 97 GEO. L.J. at 543-44; *see also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW at 876 ("The Secretary of the Interior . . . has not expressed concern over how the revenues are used by a state, so long as the exclusivity provides 'substantial economic benefit' to the tribe.").

V

From its flawed premises—that negotiated revenue sharing is a direct tax and that any state demands for revenue sharing must be accompanied by substantial concessions and a promise to use the revenues for gaming-related purposes only—the majority proceeds to consider whether the State has failed to negotiate with the Band in good faith. The majority concludes that it has. Among the majority's concerns with the State's demands, one stands above all others: in the majority's view, "the financial benefit to Rincon from the amendments proposed would be negligible: Rincon stood to gain only about $2 million in additional revenues compared to the State's expected $38 million." Maj. Op. at 5908; *see also id.* at 5903 ("We [ ] find particularly persuasive the fact that the revenue sharing demanded in this case would result in $38 million in additional net revenue to the State compared to $2 million for the tribe."); *id.* at 5885.

"IGRA's legislative history . . . makes clear that the good faith inquiry is nuanced and fact-specific, and is not amenable to bright-line rules." *Coyote Valley II*, 331 F.3d at 1113. "The terms of each compact may vary extensively depending on the type of gaming, the location, the previous relationship of the tribe and State, etc." S. REP. NO. 100-446, at 14 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3084. Even if the

State's demand for revenue sharing could be construed as a demand for direct taxation, I think the majority's concerns are misplaced and the State has not negotiated in bad faith. The State has taken a hardline position, one that the Band does not like, but that does not make it a *bad faith* negotiating position. *See, e.g., Wis. Elec. Power Co. v. Union Pac. R.R. Co.*, 557 F.3d 504, 510 (7th Cir. 2009) ("A duty of good faith does not mean that a party vested with a clear right is obligated to exercise that right to its own detriment for the purpose of benefiting another party to the contract."); *NLRB. v. Truitt Mfg. Co.*, 351 U.S. 149, 154-55 (Frankfurter, J., concurring in part and dissenting in part) (" 'Good faith' means more than merely going through the motions of negotiating; it is inconsistent with a predetermined resolve not to budge from an initial position. But it is not necessarily incompatible with stubbornness or even with what to an outsider may seem unreasonableness. . . . The previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations constitute the raw facts for reaching such a determination.").

For reasons I explain below, the way in which California authorized Indian gaming creates a bilateral monopoly that gives both parties an economic incentive to take hardline positions—positions that are perfectly consistent with the obligation to negotiate in good faith. I then explain why the State's demands are reasonable and its concessions meaningful. Because I do not think it is our place to interfere in these negotiations absent bad faith, I would let the parties work it out (or not).

## A

In California, unlike other states, Indian tribes' territorial exclusivity is enshrined in the state Constitution. California prohibits all entities other than Indian tribes from operating Nevada-style gaming within its borders. Thus, when the State negotiates a class III gaming compact with a tribe, it is negoti-

ating with the only entity legally authorized to offer such gaming in California. The State, for its part, has the sole right to authorize the operation of additional gaming machines by the tribes. The negotiation of a new compact between the State and the Band therefore presents a classic bilateral monopoly, where "two [parties] . . . bargain over some thing of value only with each other [and] neither can rely on competition to determine the price of the thing." *In re Hoskins*, 102 F.3d 311, 315 (7th Cir. 1996), *abrogated on other grounds by Assocs. Commercial Corp. v. Rash*, 520 U.S. 953 (1997); *see generally* BLACK'S LAW DICTIONARY 1098 (9th ed. 2009) (defining "bilateral monopoly" as "[a] hypothetical market condition in which there is only one buyer and one seller, resulting in transactional delays because either party can hold out for a better deal without fearing that the other party will turn to a third party").

The Band enjoys such a monopoly position. Although it can only offer class III gaming pursuant to a Tribal-State compact, *see* CAL. CONST. art. 4, § 19(f), and can only increase its number of gaming devices pursuant to a new or amended compact, at the same time, the Band is the only entity that can offer class III gaming in its immediate territory under the California Constitution. By law, the State has monopoly power over the authorization of gaming machines; equally by law, the Band is the only entity that can be authorized to offer these machines.

Here, the "thing of value" over which the State and the Band are bargaining is the revenue from additional class III gaming devices at Harrah's Rincon. According to the State's economic expert, 900 new devices would bring in an additional $40 million in gaming revenue. The "price" being negotiated here is the proportion of new gaming revenue the Band will pay to the State in exchange for these additional devices and an extension of its compact. What economists call the "bargaining range" in a bilateral monopoly can be ascertained by determining the "corner solutions"—i.e., the situa-

tions in which one party is an unmitigated winner and the other an unmitigated loser. *See generally Walgreen Co. v. Sara Creek Prop. Co.*, 966 F.2d 273, 278 (7th Cir. 1992) (noting that in such situations "[n]egotiations would be unlikely to break down completely, given such a bargaining range, but they might well be protracted and costly"). Here, the corner solutions are as follows. At one extreme, the State offers the Band some number of additional gaming devices, but the Band pays 100 percent of new revenues to the State. The State is an unmitigated winner; the Band an unmitigated loser. Assuming the Band realizes $40 million in revenues from 900 new machines, this would result in $40 million for the State, and $0 for the Band. At the other extreme, the State offers the Band some number of additional gaming devices, but the Band pays *no more to the State than it does under the current compact*; the State gains nothing at all from this transaction, while the Band gains 100% of new revenue. The Band is an unmitigated winner; the State an unmitigated loser. Assuming $40 million in revenues from 900 new machines, this would result in $40 million for the Band, and $0 for the State.

These corner solutions determine the bargaining range in negotiations between the State and the Band for a new compact allowing the Band to operate additional class III gaming devices. Assuming $40 million in new revenues, the bargaining range is anywhere between: (1) $0.01 for the State and $39,999,999 for the Band; and (2) $39,999,999.99 for the State and $0.01 for the Band. Given the vagaries and transaction costs involved in bilateral monopoly, "[t]here is no way to predict where in the bargaining range the bargain w[ill] be struck," *In re Hoskins*, 102 F.3d at 316, but "*at any price between those figures . . . both parties would be better off*," *Walgreen Co.*, 966 F.2d at 276 (emphasis added). The reason for this "any price" principle is because here, there exists another possible "corner solution" besides the two described above: the Band refuses to share revenues and the State refuses to authorize new gaming devices, and *neither party gains any additional revenue*. Under the circumstances of the

bilateral monopoly at issue here, any compact offer falling within the "bargaining range"—which includes the State's offers in this case—cannot be seen as made in "bad faith," since the Band would be offered real net gains in the millions of dollars annually under even the most parsimonious State offer.

Despite the raw economics of the situation, the majority holds that "a state may not take a 'hard line' position in IGRA negotiations when it results in a 'take it or leave it offer' to the tribe . . . ." Maj. Op. at 5909. What the majority has failed to appreciate is that the State and the Band are in precisely the same position. If the State wants additional revenue (or any additional intangible benefits from Harrah's Rincon's expanded operations), and the Band refuses to budge, the State must take or leave the Band's offer. The State has no other options available to it.

## B

Even negotiating within the framework of a bilateral monopoly, the State's offer is not one-sided. The State argues that it has offered three "meaningful concessions" to the Band: (1) territorial exclusivity, (2) an extension of the compact term, and (3) authorization for additional devices. Although I agree with the majority that the State's offer of territorial exclusivity is not a meaningful concession in light of Proposition 1A, there is no question that the State has offered a "real" concession to the Band by offering to extend the compact term and to increase the allowed number of class III gaming devices the Band can operate. I will address each in turn.

## 1

As an initial matter, I agree with the majority that the State's "offer" of territorial exclusivity is not a "meaningful concession" within the meaning of *Coyote Valley II*. *See* Maj.

Op. at 5906-09. The California Constitution already guarantees tribal exclusivity against private gaming interests, and under the Band's current compact, as modified by Addendum A, the Band retains the right to terminate its compact or to continue under the compact with reduced revenue sharing requirements "[i]n the event the exclusive right of Indian tribes to operate Gaming Devices in California is abrogated . . . ." The "revised and expanded" exclusivity provision provides no meaningful protection beyond that afforded by the Band's current compact, and thus cannot serve as consideration for an amended compact. In other words, it is not a "real" concession, *see Coyote Valley II*, 331 F.3d at 1112, but an illusory one.

2

The State's other offered concessions, however, are unquestionably "real." First, the State's offer to extend the expiration date of the Band's compact to 2045 is quite meaningful. The Band's current compact, which expires on December 31, 2020 (or June 30, 2022 if a party requests negotiations for an extension), contains no right to automatic renewal. Under the Supreme Court's decision in *Seminole Tribe v. Florida*, 517 U.S. 44 (1996), a tribe cannot sue a state in federal court under 25 U.S.C. § 2710(d)(7) *et seq.* absent an express waiver of sovereign immunity by the state. The current compact between California and the Band contains a limited waiver from the State of its sovereign immunity. *See* 1999 Compact § 9.4 *et seq.*, http://www.cgcc.ca.gov/enabling/tsc.pdf (last visited Apr. 6, 2010). Once the compact expires, *the State will not longer be subject to suit by the Band* to enforce any of IGRA's requirements, including its good faith negotiation requirement. *See Seminole Band*, 517 U.S. at 72. Thus, by offering to extend the Band's compact until 2045, the State is offering to subject itself to IGRA's requirements with respect to negotiations with the Band for an additional twenty-five years. To my mind, the State's promise to extend the compact and waive its sovereign immunity for another

twenty-five years is a substantial concession. Without it, the Band has a casino resort until 2020, but not beyond.

3

Even more "meaningful" is the State's offer to increase the number of gaming devices the Band may operate from 1600 to 2500 devices. Under the California Constitution, "[t]he Legislature has no power to authorize, and shall prohibit, casinos of the type currently operating in Nevada and New Jersey"—i.e., establishments offering Class III gaming. CAL. CONST. art. 4, § 19(e). California's Constitution provides a *limited* exception to this prohibition with respect to federally recognized Indian tribes on Indian lands: "the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law," and "slot machines, lottery games, and banking and percentage card games are . . . permitted to be conducted and operated on tribal lands *subject to those compacts*." *Id.* art. 4, § 19(f) (emphasis added). Thus, although the California Constitution allows Indian tribes to operate slot machines, banked card games, and similar activities, it does not provide blanket authorization for their operation; the Constitution explicitly requires that casino-style gaming be operated "subject to [a] compact[ ]" between the Governor and the Tribe.

Critically, since the very inception of Indian gaming compacts in California, the State has negotiated, *in gaming compacts*, limits on the scope of class III gaming, including the number of gaming devices that a tribe can operate. *See* 1999 Model Tribal-State Gaming Compact § 4.3.1 ("The Tribe may operate no more Gaming Devices than the larger of the following: (a) A number of terminals equal to the number of Gaming Devices operated by the Tribe on September 1, 1999; or (b) Three hundred fifty (350) Gaming Devices."),

http://www.cgcc.ca.gov/enabling/tsc.pdf (last visited Apr. 6, 2010).[20] As the majority itself concedes, *see* Maj. Op. at 5909-10 & n.20, device licensing is a proper subject for negotiation under IGRA, *see* 25 U.S.C. § 2710(d)(3)(C)(vi). Since tribal exclusivity is already written into the California Constitution, the number of authorized gaming devices is, at this point, *the single most important issue* subject to negotiation in Tribal-State compacts in California.[21]

When the State offered to allow the Band to operate a greater number of machines, it was not only offering a "real" or "meaningful" concession, it was offering a concession on

---

[20]The Band operates its casino subject to a compact effectively identical to this 1999 Model Compact. *See* http://www.cgcc.ca.gov/Tribal/ 1999%20Compact%20Tribes%20Gaming%20and%20Non-Gaming% 20list.pdf (last visited Apr. 6, 2010).

[21]The majority relies on a DOI letter to the Forest County Potawatomi Community of Wisconsin for the proposition that negotiations over the number of gaming devices cannot serve as adequate consideration for revenue sharing. Maj. Op. at 5910-11. Yet this letter, and the views expressed therein, are irrelevant here. In the letter, the Assistant Secretary of Indian Affairs explains that "[w]e have not, nor are we disposed to, authorize revenue-sharing payments in exchange for compact terms *that are routinely negotiated by the parties as part of the regulation of gaming activities*, such as duration, number of gaming devices, hour of operation, and wager limits." Maj. Op. at 5911 (emphasis added). However, in Wisconsin, unlike in California, the number of gaming devices a tribe may operate has *not* been limited by compact, but has been subject only to reporting requirements and tribal self-regulation. *See, e.g.,* Bad River Band of the Lake Superior Tribe of Chippewa Indians Gaming Compact § XV(C)(3), http://www.doa.state.wi.us/docview.asp?docid=2127 (last visited Apr. 6, 2010); Amendments to the Bad River Band of the Lake Superior Tribe of Chippewa Indians Gaming Compact § 7, http://www.doa.state.wi.us/ docview.asp?docid=2129 (last visited Apr. 6, 2010). Since a Wisconsin tribe could already increase the number of devices it operated without a compact amendment, the DOI opined that an offer to increase the number of allowed devices was not a meaningful concession by the State of Wisconsin. This is in stark contrast to California, where the number of allowed gaming devices has *always* been set by compact, and therefore is not now, and *never has been*, "routinely negotiated by the parties as part of the regulation of gaming activities."

the single most "meaningful" subject over which it retained control. Under our decision in *Coyote Valley II*, this means that the State did not violate § 2710(d)(4) in connection with the proposed compact. *See* 331 F.3d at 1112. Since "offered concessions by [the] State [we]re real, § 2710(d)(4) d[id] not categorically prohibit [the] fee demands" in this case. *Id.*

C

Next, I wish to address why, in light of these concessions, the disparity between the revenue sharing demanded by the State and the profits to be realized by the Band is not as great as the majority portrays it to be and why it is not, therefore, evidence of bad faith negotiations. When the Band entered into its original compact in 1999, it was operating less than two hundred gaming devices. As a consequence, the Band was exempt from making revenue payments into the SDF. In fact, the Band does not now make (and never has made) any SDF payments under its current compact.[22] In stark contrast to every tribe that has negotiated, or renegotiated, a compact with California since 1999, the Band shares no revenue with the State. But this will likely change in 2020. Without a doubt, the Band's sweetheart deal with respect to revenue sharing will not last past its current compact: every compact negotiated in California since 1999 includes either SDF or general fund revenue sharing.[23] Thus, any compact negotiation between the Band and the State—whether it be for an amended compact today or for a wholly new compact a decade from now—will inevitably include a State demand for revenue sharing of some sort; to do otherwise would put the Band in a preferred position *vis-a-vis* the other tribes in California.

---

[22]*See* List of SDF Paying Tribes, http://www.cgcc.ca.gov/Tribal/2008/ SDF%20Paying%20Tribes%20for%20Website%202008.pdf (enumerating twenty-one tribes making SDF payments under their current compacts (last visited Apr. 6, 2010), of which the Band is not one).

[23]*See generally* Tribal-State Gaming Compacts, http://www.cgcc.ca. gov/compacts.asp (last visited Apr. 6, 2010).

In *Coyote Valley II*, we approved of the SDF revenue sharing provisions in compacts negotiated by the Davis Administration. We recognized that "the contributions tribes must make to the SDF are significant," but concluded that, in light of the State's concession of exclusivity, it was not "inimical to the purpose or design of IGRA for the State . . . to ask for a reasonable share of tribal gaming revenues." 331 F.3d at 1114-15. Here, the majority declares that the State's revenue sharing proposals in the negotiations with the Band differ so vastly from the "reasonable share of tribal revenues" paid under the SDF provision by the *Coyote Valley II* tribes that the State's bad faith is conclusively established:

> [T]he calculations presented by the State's *own* expert reveal that the financial benefit to Rincon from the amendments proposed would be negligible: Rincon stood to gain only about $2 million in additional revenues compared to the State's expected $38 million. Thus, in stark contrast to *Coyote Valley II*, the relative value of the demand versus the concession here strongly suggests the State was improperly using its authority over compact negotiations to impose, rather than negotiate for, a fee. Under IGRA and *Coyote Valley II*, that is bad faith.

Maj. Op. at 5908-09 (citation omitted).

The majority's analysis on this point could not diverge any more sharply from the reality of what we deemed to be a "reasonable share of tribal gaming revenues" in *Coyote Valley II*. 331 F.3d at 1115. Under the SDF formula—and using the same economic model used to calculate the majority's $38 million-$2 million split—the Band would be required to pay $35.8 million to the state, and would keep approximately $4 million in net revenues.[24] There is simply no logical basis for

---

[24]These calculations are based on the State's expert testimony referred to in the majority opinion. Using a net win of $369 per day per machine for 2,500 machines gives the following payments to the State:

simultaneously deeming a formula leading to a $36 million-$4 million split in net revenues "a reasonable share," and a formula leading to a $38 million-$2 million split in net revenues so substantively and objectively unreasonable as to constitute "bad faith." I do not see how the majority's analysis can be reconciled with *Coyote Valley II*.

Furthermore, although the Band is not required to make SDF payments under its current compact,[25] once the Band's current compact expires in 2020, the State will certainly insist on revenue sharing at a level at least equal to the SDF level required of other tribes and already approved by this court in *Coyote Valley II*. Thus, come 2020, the Band will likely be faced with the following choice: negotiate a new compact with the State that will include at least SDF-level revenue sharing, or cease class III gaming. The State's offer here, however, not only extends the Band's compact until 2045, but allows the Band to make *more money* now and over the next decade leading up to 2020. The State has offered a ten-year revenue stream of $2 million annual payments *to which the Band would not otherwise be entitled*; after ten years has passed, the Band will be able to conduct class III gaming under a revenue sharing agreement similar to that which the

_____

(1) Under the State's 10 percent/15 percent revenue sharing proposal deemed to be "bad faith" by the majority:

(0.10 2005 Gross Revenues of $197 million) + (0.15 $369/day 365 days 900 machines) = $37.9 million

(2) Under the SDF structure we deemed to be "a reasonable share of tribal revenues" in *Coyote Valley II*:

$369/day 365 days (0.07 300 machines + 0.10 500 machines + 0.13 1500 machines) = $35.8 million

[25]Tribes that did not operate 200 or more gaming devices as of September 1, 1999 were not required to contribute to the SDF under the 1999 Compact. The Band was not operating 200 or more devices as of September 1, 1999 and is therefore exempt from SDF payments under its current compact.

State would no doubt insist upon in negotiating a new compact. In sheer monetary terms, the State is offering concessions with a net present value of approximately $19.5 million.[26] If this is not "meaningful," I'm not sure what is.

Nothing that I have said here is an endorsement of the State's terms. I don't know whether the State's offer is a "good" one or not. The point is not whether the State's offer is "good" or "bad." We are not the Band's advisors or guardians ad litem. The Band has been well represented in this proceeding, and I am sure it has been well advised throughout these negotiations as well. All we have to decide is whether the State has negotiated in good faith, not whether it has made the Band a good offer. I would hold that these terms have been offered in good faith.

D

Finally, there is abundant real-world evidence that the State's offers were not made in bad faith: specifically, numerous tribes in California (none of whom are barred by the Eleventh Amendment from suing California in federal court) have *agreed* to compact terms effectively identical to those offered by the State. Fifteen tribes currently contribute gaming revenue to the State's General Fund, *see* http://www.cgcc.ca.gov/ Tribal/2009/GF%20Paying%20Tribes%20for%20Website %2003-04-09.pdf (last visited Apr. 6, 2010), all pursuant to compacts negotiated or renegotiated since 2003, http://www.cgcc.ca.gov/compacts.asp (last visited Apr. 6, 2010). Notably, eleven of the tribes that currently contribute class III gaming revenues to the State's general fund are 1999 Compact tribes (like the Band) who now contribute to the

---

[26]This net present value calculation assumes the federal funds discount rate remains at a near-record low 0.50. If the rate were to rise to a more normal level—averaging, say, 2.25 over the next decade—the net present value of the bargained-for income stream would decrease to $17.7 million, still a "meaningful" sum.

State's general fund pursuant to *renegotiated* compacts that allowed these tribes to operate additional devices in exchange for general fund revenue sharing. *Id.*; *see, e.g.,* Shingle Springs Band of Miwok Indians Compact § 4.3.1, http://www.cgcc.ca.gov/compacts/Shingle%20Springs%20 Compact.pdf (last visited Apr. 6, 2010) (amending 1999 Compact to increase allowed devices to 5,000 and providing for general fund revenue sharing of 20% for first $200 million in net win and 25% for net win exceeding $200 million). And whatever questions these compacts may have raised for the Secretary of the Interior, the Secretary ultimately accepted the negotiations and declined to disapprove all of the compacts and their amendments.

In other words, the State has regularly proposed, the tribes have regularly accepted, and the Secretary has regularly approved contract terms similar to those proposed by the State in this case. Although it is true, as the majority posits, that the fact that numerous tribes have agreed to general fund revenue sharing would not insulate such revenue sharing from IGRA's substantive requirements, it defies logic to hold, as does the majority, that a contract proposal readily agreed to by a dozen other tribes was so outrageously one-sided that it could only have been made in "bad faith." *See* Maj. Op. at 5892, 5914-15; *see also Wis. Elec. Power Co.*, 557 F.3d at 510 ("the duty of good faith does not require your putting one of your customers ahead of the others"). Yet this is what 25 U.S.C. § 2710(d)(7)(B)(iii) requires for court intervention. The provision does not prohibit "hard bargaining" within the negotiating range of the Tribal-State compact bilateral monopoly, but is instead concerned solely with "bad faith" based on an "inquiry [that] is nuanced and fact-specific, and is not amenable to bright-line rules," *Coyote Valley II*, 331 F.3d at 1113, and which takes into account "the previous relationship of the tribe and State," S. Rep. No. 100-446, at 14 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3084. The negotiations at issue here, even though inconclusive, have been well within those parameters.

As we explained in *Coyote Valley II*:

> Congress did not intend to allow States to invoke their economic interests as a justification for excluding Indian tribes from class III gaming; nor did Congress intend to permit States to use the compact requirement as a justification for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes. By the same token, however, Congress also did not intend to require that States ignore their economic interests when engaged in compact negotiations. *See* [S. Rep. No. 100-446, at 2, *reprinted in* 1988 U.S.C.C.A.N. 3071, 3071] ("An objective inherent in any government regulatory scheme is to achieve a fair balancing of competitive economic interests."). Indeed, § 2710(d)(7)(B)(iii)(I) expressly provides that we may take into account the "financial integrity" of the State and "adverse economic impacts on the State's existing gaming activities" when deciding whether the State has acted in bad faith, and IGRA's legislative history explains that a State's governmental interests with respect to class III gaming on Indian lands include its economic interest in raising revenue for its citizens.

331 F.3d at 1115 (quotation marks, brackets, ellipses, and internal citation omitted).

## VI

The majority's legal errors carry grave—and widespread—practical repercussions. The majority's decision will call into question Tribal-State gaming compacts not just in cash-strapped California, where no fewer than fifteen Tribal-State compacts provide for general fund revenue sharing, *see* http://www.cgcc.ca.gov/Tribal/2009/GF%20Paying%20Tribes%20for%20Website%2003-04-09.pdf (last visited Apr. 6,

2010), but throughout the country.[27] The Second Circuit has never addressed a legal challenge to the Connecticut compacts governing the behemoth Foxwoods and Mohegan Sun Casinos, but the majority decision here will inevitably spur such challenges in Connecticut and in New York. The Sixth, Tenth, and Eleventh Circuits have yet to consider the validity of general revenue sharing under IGRA, but it can reasonably be expected that district court clerks in Michigan, New Mexico, Oklahoma, and Florida will be docketing legal challenges sometime soon. These lawsuits—based on a misreading of IGRA by the majority in the first federal appellate decision to squarely address the legality of negotiated general fund revenue sharing—will eat up State, tribal, and federal resources and will unsettle dozens of mutually beneficial revenue-sharing provisions that have fed both tribal coffers and revenue-hungry state treasuries.

I respectfully dissent.

---

[27]The majority is correct to point out that although California has waived its sovereign immunity to suits under IGRA, not all states have done so. But the majority is premature to conclude that tribes in those states could not challenge the legality of compact negotiations. *See* Maj. Op. at 5885-86 n.8. After the *Seminole Tribe* decision, the Secretary promulgated 25 C.F.R. Part 291, which "establish[es] procedures that the Secretary will use to promulgate rules for the conduct of Class III Indian gaming when: (a) A State and an Indian tribe are unable to voluntarily agree to a compact and; (b) The State has asserted its immunity from suit brought by an Indian tribe under 25 U.S.C. § 2710(d)(7)(B)." 25 C.F.R. § 291.1. In 2007, a divided Fifth Circuit panel held that IGRA did not authorize 25 C.F.R. Part 291. *See Texas v. United States*, 497 F.3d 491 (5th Cir. 2007), *cert. denied*, 129 S. Ct. 32 (2008). It appears that the Department of the Interior has refused to acquiesce in the Fifth Circuit's decision, *see Alabama v. United States*, 630 F. Supp. 2d 1320, 1332 (S.D. Ala. 2008), indicating that the invalidity of the regulations is hardly a settled issue outside the Fifth Circuit. Notably, no other circuit court—including the Second, Sixth, Tenth, and Eleventh Circuits (home to Connecticut, Michigan, New Mexico and Oklahoma, and Florida, respectively)—has held the Part 291 regulations to be invalid.